112 F.3d 523
 37 Collier Bankr.Cas.2d 1667, Bankr. L. Rep. P 77,350
UNITED STATES of America, Appellee,
v.
Michael D. SHADDUCK, Defendant, Appellant. (Two Cases)
UNITED STATES of America, Appellee,
v.
Andrea D. SHADDUCK, Defendant, Appellant.
 Nos. 95-1395, 95-1396 and 96-1342.
 United States Court of Appeals,
First Circuit.
 Heard Jan. 9, 1997.
Decided April 24, 1997.
 
 James B. Krasnoo with whom Law Offices of James B. Krasnoo, Andover, MA, was on brief, for appellants.
 Mark J. Balthazard, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief, for appellee.
 Before CYR, Circuit Judge, CAMPBELL, Senior Circuit Judge, and STAHL, Circuit Judge.
 CYR, Circuit Judge.
 
 
 1
 Appellants Michael and Andrea Shadduck challenge the judgments of conviction and sentence entered against them for bankruptcy fraud, see 18 U.S.C. § 152, following their four-day jury trial. We affirm the convictions, but vacate, in part, the sentence imposed upon Michael Shadduck and remand for resentencing.
 
 
 2
 * BACKGROUND[1]
 
 
 3
 Appellant Michael Shadduck ("Shadduck"), a self-employed insurance salesman, invested in several insurance policies and a pension fund with Guardian Investor Services Corporation ("Guardian"). Three days before the Shadducks filed their joint chapter 11 petition on June 4, 1993, Shadduck had requested the maximum loan advances available on four Guardian life insurance policies. The chapter 11 petition, unaccompanied by schedules, listed liabilities totaling $2,269,381.13 to the twenty largest unsecured creditors.
 
 
 4
 On the day the joint chapter 11 petition was filed, Mrs. Shadduck drew an $8,000 check on their personal checking account and endorsed it over to her husband. Three days later, four checks totaling $124,383.66 were deposited in a bank account in the name of John Shepard, a friend of Shadduck. Three checks had been issued to Shadduck by Guardian and represented portions of the aforementioned loan proceeds, as well as policy dividends. The fourth was the $8,000 check withdrawn by Mrs. Shadduck from the joint account three days earlier.
 
 
 5
 At the creditors meeting on June 14, Shadduck denied having made any payment in excess of $600 to any creditor within the 90-day period preceding June 4, denied having a bank account, and disavowed any beneficial interest either in insurance policies or a pension plan. Mrs. Shadduck, who was continuing to write checks on their joint checking account during this time, remained silent as her husband made these misrepresentations under oath.
 
 
 6
 Following the creditors meeting, two other Guardian checks, totaling $13,346.01, payable to Shadduck and endorsed over to Shepard, were deposited in the Shepard account. Two days later Shadduck gave Shepard a $73,900 check, drawn on Shadduck's Guardian pension plan and endorsed over to Shepard. At the time, the Shadduck pension plan account contained $118,339.05. On July 19, 1993, a $33,517.36 check was drawn on the Shadduck pension plan account, representing the balance in the pension plan after the required $10,921.69 withholding for federal income tax.
 
 
 7
 On July 1, the Shadducks filed their bankruptcy schedules, signed the same day under penalty of perjury, asserting that they had no interest in pension plans or insurance policies and, further, that they had no bank account. Throughout this entire period, however, Shadduck had funds in his pension plan and Mrs. Shadduck continued to write checks on their joint checking account. Shepard subsequently drew checks totaling $171,211.12 to Shadduck on September 29 and November 2, 1993, in amounts mirroring the checks Shadduck had issued to Shepard the previous June. Three of these checks, totaling $17,134.70, explicitly noted that the proceeds represented pension plan funds.
 
 
 8
 The Shadducks were indicted on January 19, 1994: he on four counts, for concealing assets and falsely stating that he had no bank account, insurance policies, or pension plan, in violation of 18 U.S.C. § 152; she on one count, for falsely stating she had no bank account. At trial, Shadduck admitted making false statements but nevertheless insisted that he had not listed the pension plan funds on the schedules because they were exempt, even though he concededly had failed also to list any pension plan funds as property claimed exempt. Shadduck further testified that the monies invested in the insurance policies belonged to clients who had requested that he invest approximately $85,000 in their behalf. Shadduck admitted making false statements at the creditors meeting and on the bankruptcy schedules, but vouchsafed that his wife had not known what was going on.
 
 
 9
 After the jury returned guilty verdicts against both defendants, the district court sentenced Shadduck to twenty-seven months' imprisonment, including enhancements based on the total intended loss, see U.S.S.G. § 2F1.1(b)(1) (Nov. 1994), violation of a judicial order, id. § 2F1.1(b)(3)(B), and defrauding multiple victims, id. § 2F1.1(b)(2)(B). Shadduck appeals his convictions and sentence. Mrs. Shadduck, who was sentenced to two years' probation, principally challenges her conviction.[2]
 
 II
 DISCUSSION
 1. Andrea Shadduck
 
 10
 Andrea Shadduck concedes that she purchased the $8,000 bank check with funds drawn from the joint checking account and endorsed it to her husband, that she signed the bankruptcy schedules listing no bank account, and that she remained silent at the creditors meeting while her husband falsely represented that they had no bank account. She nonetheless contends that there was insufficient evidence that she intentionally made a false statement, since her husband testified to her lack of knowledge.
 
 
 11
 There was ample evidence to support the conviction. The jury reasonably could infer from all the circumstances, especially the timing of the various transactions, that she possessed the requisite fraudulent intent. She drew an $8,000 bank check on the unscheduled joint checking account the very day she and her husband signed and filed their joint chapter 11 petition. She signed the bankruptcy schedule stating she had no bank account, yet continued to draw checks on the joint account for more than three months, even after her husband, in her presence, falsely denied the existence of any such account at the creditors meeting. This circumstantial evidence alone supported a reasonable inference that her motive in making the $8,000 withdrawal from the joint checking account on the eve of bankruptcy was to prevent its disclosure to creditors. Finally, fraudulent intent was readily inferable from the fact that the Shadducks omitted from their joint list of claimed exemptions only the property not elsewhere disclosed as assets on their schedules.[3] Moreover, the jury was free to discredit the exculpatory testimony offered by her husband, United States v. Restrepo-Contreras, 942 F.2d 96, 99 (1st Cir.1991), and we are not at liberty to presume otherwise, see United States v. Laboy-Delgado, 84 F.3d 22, 26 (1st Cir.1996) (noting that appellate court must "resolve all disagreement regarding the credibility of witnesses to the government's behoof").
 
 2. Michael Shadduck
 
 12
 a. Supplemental Jury Instruction[4]
 
 
 13
 Shadduck claims the jury verdict was tainted by the response to a question submitted by the jury.[5] Although Shadduck would have us isolate the trial court's supplemental instruction, the law is clear that it " 'must be viewed in the context of the overall charge.' " United States v. Femia, 57 F.3d 43, 47 (1st Cir.) (quoting Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400-01, 38 L.Ed.2d 368 (1973)), cert. denied, --- U.S. ----, 116 S.Ct. 349, 133 L.Ed.2d 245 (1995). The general charge had explained, with respect to each count, that the jury would need to determine whether the alleged false statements and concealment had been "knowing" and "fraudulent." There was no objection to the general charge.
 
 
 14
 Several hours after retiring to deliberate, the jury inquired in writing whether there would be a change in the ownership of certain funds invested in an annuity contract under the name of one Leonard Roy were the jury to find Shadduck guilty. The trial judge replied that there was no evidence on which to base a response to their inquiry and that they were not to consider this collateral matter in arriving at their verdicts. The court added:
 
 
 15
 You should decide whether you believe that [Shadduck] intentionally made a false statement or he did not make a false statement in regard to this material. That is the issue before you.
 
 
 16
 Shadduck objected that a further instruction was required to the effect that the jury would need to determine whether Shadduck had made the statements "fraudulently." After explaining that its response was consistent with its earlier and more detailed charge, the court denied the request. Later, Shadduck unsuccessfully moved for a mistrial on the ground that the response to the jury inquiry effectively had eliminated an element of the offense.
 
 
 17
 Viewed in the context of the entire charge, and given the clear signal from the trial judge that the jury inquiry related to a collateral matter not appropriate for their consideration, the response was entirely proper. It did nothing to disturb, let alone gainsay, the very clear instruction in the general charge; viz., that the jury must determine whether the alleged conduct had been undertaken "knowingly" and "fraudulently."
 
 
 18
 Now, ... the offenses ... are alleged to have been done "knowingly and fraudulently."An act or failure to act is "knowingly" done if it's done voluntarily and intentionally and not because of mistake or accident or any other innocent reason.
 
 
 19
 The purpose of requiring that the government ... prove that a defendant acted "knowingly" is to insure that no one is convicted because of an act, or failure to act, due to a mistake or an accident or some--any innocent reason.
 
 
 20
 An act or failure to act is "fraudulently" done if it is done willfully and with the intent to deceive or cheat any creditor, trustee or bankruptcy judge.
 
 
 21
 An act or failure to act is "willfully" done if it is done voluntarily and intentionally and with a specific intent to do something which the law forbids; that is to say, for bad purpose either to disobey or disregard the law.
 
 
 22
 ....
 
 
 23
 The intent with which an act is done may also be inferred from the nature of the act itself. Accordingly, intent, willfulness and knowledge are usually established by surrounding facts and circumstances as of the time the acts in question occurred or the events took place and the reasonable inferences to be drawn from them.
 
 
 24
 (Emphasis added.) Thus, the court defined both "knowingly" and "fraudulently" through direct reference to the voluntariness, as well as the general and specific intent, animating Shadduck's conduct.
 
 
 25
 Against the backdrop of this earlier detailed instruction, we are not persuaded that any significant risk of confusion arose from the subsequent umbrella response to the jury that it was to decide whether Shadduck "intentionally" made false statements. See United States v. Yefsky, 994 F.2d 885, 899 (1st Cir.1993) (instruction on "intent," rather than "specific intent," held adequate given court's earlier definition of "willfully" as encompassing specific intent); United States v. Nichols, 820 F.2d 508, 511 (1st Cir.1987) (unnecessary to instruct on specific intent "[g]iven the extensive instruction on 'knowingly and willfully' [delivered] moments earlier").
 
 
 26
 b. Calculation of Intended Loss ( U.S.S.G. § 2F1.1 )
 
 
 27
 The district court imposed an eight-level sentence enhancement based on its finding that Shadduck had intended to cause loss totaling $246,280. See U.S.S.G. § 2F1.1, comment. (n.7). ("[I]f [the] loss that the defendant was intending to inflict can be determined, this figure will be used if it is greater than the actual loss."). On appeal, Shadduck claims for the first time that the loss calculation, which included the loans obtained against the Guardian insurance policies and the funds withdrawn from the pension plan, must be set aside because those monies were in all events exempt under Bankruptcy Code § 522, hence not subject to administration in bankruptcy.[6] As Shadduck failed to object below, we review only for "plain error." United States v. Carrington, 96 F.3d 1, 6 (1st Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1328, 137 L.Ed.2d 489 (1997); see also Koon v. United States, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 1777-78, 123 L.Ed.2d 508 (1993) ("plain error" means "obvious" error); see also Fed.R.Crim.P. 52(b).
 
 
 28
 The present contention assumes, contrary to our caselaw, that property of the debtor neither claimed nor set apart as exempt would not have been subject to administration. See Petit v. Fessenden, 80 F.3d 29, 33 (1st Cir.1996); Mercer v. Monzack, 53 F.3d 1, 3 (1st Cir.1995), cert. denied, 517 U.S. 1103, 116 S.Ct. 1317, 134 L.Ed.2d 471 (1996); see also 11 U.S.C. § 522(l) (requiring debtor to list property claimed exempt); Fed. R. Bankr.P. 4003(b). As the Supreme Court recently held, Bankruptcy Code § 522(l) and Bankruptcy Rule 4003(b) are to be interpreted in accordance with their literal intendment. See Taylor v. Freeland & Kronz, 503 U.S. 638, 643-45, 112 S.Ct. 1644, 1648-49, 118 L.Ed.2d 280 (1992); see also Mercer, 53 F.3d at 3.
 
 
 29
 Virtually all property of the debtor, except as provided in Bankruptcy Code § 541(b),(c)(2) & (d), becomes "property of the estate" by operation of law without regard to whether it is listed on the schedules. Id. § 541(a). Shadduck has never argued that these pension plan monies were not "property of the estate,"[7] but only that they were not subject to process under applicable state law.[8]
 
 
 30
 Were we to adopt the regime advocated by Shadduck, property fraudulently concealed throughout the course of a bankruptcy proceeding nonetheless would become exempt by operation of law.[9] By contrast, property duly claimed exempt by an honest debtor does not become exempt by operation of law unless no "party in interest" objects to the exemption claim within the allotted thirty-day period. See In re Edmonston, 107 F.3d 74, 76 (1st Cir.1997); 11 U.S.C. § 522(l); Fed. R. Bankr.P. 4003(b). Thus, the argument advanced by Shadduck would short-circuit the exemption-claim screening process explicitly envisioned in Fed. R. Bankr.P. 4003(b), which provides that the thirty-day limitation on objections to exemption claims "does not begin to run until the debtor lists the 'property claimed as exempt.' " Mercer, 53 F.3d at 3 (quoting Fed. R. Bankr.P. 4003(b)). See also Petit, 80 F.3d at 33 ("Unless and until a debtor files a timely claim of exemptions, however, as required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, there is no 'list of property claimed exempt' for the trustee or creditors to oppose."). We therefore reject it and affirm the district court's "intended loss" calculation.
 
 
 31
 c. Enhancement for Violating a Judicial Order ( U.S.S.G. § 2F1.1(b)(3)(B) )[10]
 
 
 32
 (i) Judicial Order
 
 
 33
 The district court imposed a two-level enhancement on the ground that Shadduck had violated a judicial "order," within the meaning of U.S.S.G. § 2F1.1(b)(3)(B) (1994) (prescribing two-level enhancement for violating "any judicial or administrative order, injunction, decree, or process"), by repeatedly flouting the obvious intendment behind the Bankruptcy Rules and Official Forms that all property of the debtor be disclosed. See United States v. Shadduck, 889 F.Supp. 8, 10 (D.Mass.1995). See also United States v. Bellew, 35 F.3d 518, 520-21 (11th Cir.1994) (affirming enhancement because Bankruptcy Rules and Official Forms are "judicial orders").
 
 
 34
 Shadduck contends that the term "order," as used in section 2F1.1(b)(3)(B), contemplates only a specific order, such as a consent decree or an adjudicative order or mandate entered pursuant to judicial direction. He argues that to uphold the enhancement absent a specific order would permit its automatic application in any bankruptcy fraud case, simply by virtue of the forum in which the false statements were made and without regard to the aggravated criminal intent which the enhancement was designed to redress. As hereinafter discussed, we are unable to agree that a bankruptcy rule or official form is a "judicial order," as the term is used in section 2F1.1(b)(3)(B).
 
 
 35
 First, it is clear that the bankruptcy judge never entered an order specifically directing Shadduck to disclose property of the debtor. See Bankruptcy Code § 541(a), 11 U.S.C. § 541(a). The district court implicitly acknowledged as much through its reliance on the several verification requirements in the Official Forms, see Official Bankr.Forms 1, 6, 11 U.S.C. (requiring debtor's signature verifying assertions in petition and schedules); Fed. R. Bankr.P. 1008 (mandating verification of forms); 9011 (signature constitutes representation by signatory that information provided is true). See Shadduck, 889 F.Supp. at 10; see also Bellew, 35 F.3d at 520. Thus, as the bankruptcy court entered no "order, injunction or decree" directing Shadduck to disclose property of the debtor, the enhancement cannot stand unless the district court correctly determined that the universal admonitions in the various Official Forms and/or Bankruptcy Rules applicable to all debtors in bankruptcy proceedings constitute "judicial or administrative order[s]" within the meaning of U.S.S.G. § 2F1.1(b)(3)(B).
 
 
 36
 We turn to the guideline commentary for further assistance. See Stinson v. United States, 508 U.S. 36, 42-43, 113 S.Ct. 1913, 1917-18, 123 L.Ed.2d 598 (1993) ("Commentary which functions to interpret [a] guideline or explain how it is to be applied controls.") (internal quotation marks omitted); see also United States v. Weston, 960 F.2d 212, 219 (1st Cir.1992). The application note accompanying U.S.S.G. § 2F1.1(b)(3)(B) focuses upon violations of prior orders, injunctions, and decrees. See U.S.S.G. § 2F1.1, comment. (n.5) (adverting to defendant's "knowledge of the prior decree or order").[11] The accompanying exemplar describes a defendant who had been enjoined in a prior proceeding from engaging in certain conduct, but who violated the injunction anyway by committing the fraud for which he was awaiting sentence. Id., see supra n. 11. Thus, the commentary makes clear that the rationale for the enhancement is to redress the "aggravated criminal intent" inherent in violating a prior order specifically enjoining the defendant, or an entity the defendant controlled, from engaging in the fraudulent conduct which formed the basis for the offense of conviction. U.S.S.G. § 2F1.1, comment. (backg'd).
 
 
 37
 In the instant case, no pertinent order, decree or injunction ever entered prior to the bankruptcy fraud perpetrated by Shadduck, either in the bankruptcy proceeding itself or in any prior judicial or administrative proceeding. To be sure, Shadduck attempted to cover up the bankruptcy fraud with false statements in the petition and schedules submitted to the bankruptcy court, see Official Bankr.Forms 1, 6, 11 U.S.C, as well as under oath at the creditors meeting. Thus, by concealing property of the debtor notwithstanding the copious admonitions, instructions, and verifications in the Bankruptcy Rules and Official Forms, Shadduck unquestionably committed bankruptcy fraud. See 18 U.S.C. § 152.
 
 
 38
 Nevertheless, if the government cannot demonstrate that a prior order, decree or injunction prohibited the defendant (or an entity controlled by the debtor) from engaging in the type of fraudulent conduct which formed the basis for his conviction, there has been no showing that the defendant acted with the aggravated criminal intent envisioned by the Sentencing Commission in section 2F1.1(b)(3)(B), as illustrated by the applicable guideline text and commentary. See United States v. Carrozzella, 105 F.3d 796, 800 (2d Cir.1997) (the defendant "violated a command not to file false accounts, but the command was a rule applicable to all [debtors] and not specifically directed to him.").[12]
 
 
 39
 The nearest likeness to a section 2F1.1(b)(3)(B) "order" contained in the Official Forms is the "Notice of Commencement of Case Under Chapter 11 of the Bankruptcy Code, Meeting of Creditors, and Fixing of Dates," Official Bankr.Form 9, 11 U.S.C., which is mailed by the bankruptcy court clerk's office to the debtor and all creditors. Virtually identical variations on Form 9 are entered routinely in most bankruptcy proceedings. Form 9 bears the preprinted name of the Bankruptcy Court Clerk, acting "for the court," see id., and directs the debtor to appear at the meeting of creditors to provide sworn testimony. Id. In the latter respect, Form 9 is no more akin to a judicial order than is the administration of the oath itself.
 
 
 40
 Official Form 9 resembles in considerable measure the official letter of warning discussed in United States v. Linville, 10 F.3d 630 (9th Cir.1993), with respect to which the Ninth Circuit explained:
 
 
 41
 It is pellucid that there is a vast difference between ignoring prior decrees, orders and injunctions after being subject to formal proceedings, and ignoring letters and the like, no matter how official they might look. To hold otherwise would compel enhancements in every criminal case where a defendant was told by someone in authority that what she was doing was illegal, rather than limiting them to more relatively unusual cases where someone violated a specific court or agency order or adjudication.
 
 
 42
 Id. at 632-33 (emphasis added). Similarly, the notice of meeting of creditors mailed by the bankruptcy clerk is an advisory which rises neither to the level of a judicial nor an administrative order under any conventional meaning of the term.
 
 
 43
 Thus, neither section 2F1.1(b)(3)(B) itself, nor the relevant commentary, supports the enhancement rationale relied upon below, since their language plainly indicates that the enhancement was meant to apply to defendants who have demonstrated a heightened mens rea by violating a prior "judicial or administrative order, decree, injunction or process." See U.S.S.G. § 2F1.1(b)(3)(B), comment. (n.5), (backg'd). Were an enhancement to be predicated on the ground that Official Form 9 constitutes a "judicial order," it would become applicable in all bankruptcy fraud cases, simply by virtue of the forum in which the false statements were made and without regard to the aggravated criminal intent it was designed to redress. Any such automatic application in bankruptcy fraud cases, especially absent the required mens rea, would work an amendment of the guideline, see id. § 2F1.1(b)(3)(B) (prescribing minimum offense level of ten after enhancement); see id. § 2F1.1(a) (setting BOL at six). As we can discern no hint that the Commission meant to distinguish bankruptcy fraud from other frauds in this regard, see U.S.S.G. § 2F1.1, comment. (backg'd) (explaining that fraud guideline "is designed to apply to a wide variety of fraud cases"), we conclude that the two-level enhancement imposed on Shadduck for violating a judicial order (U.S.S.G. § 2F1.1(b)(3)(B)) was erroneous and cannot stand.
 
 
 44
 (ii) Judicial Process
 
 
 45
 The government contends, in the alternative, that Shadduck violated a "judicial ... process," see U.S.S.G. § 2F1.1(b)(3)(B), by committing a bankruptcy fraud which abused the bankruptcy process itself. See United States v. Messner, 107 F.3d 1448, 1456-57 (10th Cir.1997) (holding that bankruptcy fraud constitutes violation of "judicial process"); United States v. Welch, 103 F.3d 906, 908 (9th Cir.1996) (per curiam) (same); United States v. Michalek, 54 F.3d 325, 330-33 (7th Cir.1995) (same); United States v. Lloyd, 947 F.2d 339, 340 (8th Cir.1991) (same). We decline to address the claim for several reasons.
 
 
 46
 First, the district court explicitly declined to reach the question after holding that Shadduck had violated a judicial order. Shadduck, 889 F.Supp. at 10. Second, no exceptional circumstance warrants our consideration of the claim before the district court (as it is free to do) has occasion to consider it on remand. See United States v. Morales-Diaz, 925 F.2d 535, 540 (1st Cir.1991). Third, the issue is not free from doubt. See Carrozzella, 105 F.3d at 799-802 (questioning rationale employed in cases which hold that "abuse" of bankruptcy proceeding itself constitutes "violation" of judicial "process"); see also United States v. Krynicki, 689 F.2d 289, 292 (1st Cir.1982) (before addressing issue first raised on appeal, appellate court should consider whether correct resolution is clear).
 
 
 47
 d. Multiple-Victims Enhancement (U.S.S.G. § 2F1.1(b)(2)(B))
 
 
 48
 The district court imposed a two-level enhancement pursuant to U.S.S.G. § 2F1.1(b)(2)(B), based on its finding that Shadduck had engaged in a scheme to defraud more than one victim. Shadduck, 889 F.Supp. at 11. Shadduck complained below that his crime was victimless, in that the monies he concealed were exempt and, therefore, that neither the trustee nor the creditors can be considered victims. On appeal, however, Shadduck presses only two arguments: (i) the trustee alone qualifies as a victim, and (ii) the multiple-victims enhancement, in tandem with the enhancement under U.S.S.G. § 2F1.1(b)(3)(B), see supra pps. 14-19, amounted to impermissible "double counting." As neither argument was raised below, we review only for "plain error." See United States v. Lilly, 13 F.3d 15, 17-18 (1st Cir.1994).
 
 
 49
 There is no merit in the contention that the trustee alone was victimized by the concealment. As used in subsection 2F1.1(b)(2)(B), the phrase " '[s]cheme to defraud more than one victim,' ... refers to a design or plan to obtain something of value from more than one person. In this context, 'victim' refers to the person or entity from which the funds are to come directly." U.S.S.G. § 2F1.1, comment. (n.3). Thus, the relevant commentary makes clear that the primary victims of a bankruptcy fraud, for the most part, are the individual creditors.
 
 
 50
 Nevertheless, as the representative of the debtor estate, see Bankruptcy Code § 323(a), 11 U.S.C. § 323(a), it is incumbent upon the trustee to collect and reduce to money all nonexempt assets of the estate, id. § 704(1). Accordingly, although the trustee has no prepetition claim to property of the debtor and therefore does not qualify as a "creditor," a prescribed portion of the net recoveries from any "property of the estate" administered by the trustee comprises a priority cost of administration as provided in Bankruptcy Code §§ 326(a), 330(a)(1), 503(b)(1)(A) & 507(a)(1). Consequently, not only creditors but the chapter 7 trustee as well may be victimized directly by a bankruptcy fraud to the extent it deprives the estate of assets otherwise subject to administration.
 
 
 51
 Moreover, it is likewise clear that Shadduck schemed to obtain something of value. By concealing pension plan funds and insurance policies which were neither claimed nor set apart as exempt, Shadduck attempted to retain property of the estate otherwise subject to administration for the benefit of creditors.[13] See Taylor, 503 U.S. at 643-44, 112 S.Ct. at 1648-49; Mercer, 53 F.3d at 3 (property claimed exempt is initially "property of the estate" and becomes exempt only if there is no timely objection to exemption claim).
 
 
 52
 The second challenge Shadduck makes to the multiple-victims enhancement--that it amounts to impermissible "double counting" when imposed with the enhancement for violating a judicial order--need not be discussed at this time given our decision to set aside the latter ruling. See supra pps. 528-31. Consequently, we affirm the two-level enhancement imposed pursuant to U.S.S.G. § 2F1.1(b)(2)(B).
 
 III
 CONCLUSION
 
 53
 For the foregoing reasons, appellants' convictions are affirmed. Andrea Shadduck's sentence is affirmed. Michael Shadduck's sentence is affirmed in part and vacated in part, and the case is remanded to the district court for resentencing.
 
 
 54
 So Ordered.
 
 
 
 [1]
 Viewing the evidence in the light most favorable to the verdicts, we recite the facts as the jury reasonably could have found them. United States v. Josleyn, 99 F.3d 1182, 1185 n. 1 (1st Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997). We note, however, that the record on appeal is incomplete, particularly as it includes no district court trial transcript. Of course, the proponent of a claim must "bear the brunt of an insufficient record on appeal." Real v. Hogan, 828 F.2d 58, 60 (1st. Cir.1987). See also LaRou v. Ridlon, 98 F.3d 659, 664 n. 8 (1st Cir.1996)
 
 
 [2]
 Although both appellants challenge the § 2F1.1(b)(3)(B) enhancement, the district court imposed a downward departure before sentencing Mrs. Shadduck to probation. United States v. Shadduck, 889 F.Supp. 8, 11-12 (D.Mass.1995). Thus, no purpose would be served by remanding for resentencing in these circumstances
 
 
 [3]
 Mrs. Shadduck also urges us to consider testimony presented by her counsel at a postjudgment hearing to correct Shadduck's sentence pursuant to 28 U.S.C. § 2255. Counsel testified that the joint checking account had been inadvertently omitted from the schedules. In evaluating a challenge to the sufficiency of the evidence on direct appeal, however, we may consider only the evidence presented at trial. See United States v. Laboy-Delgado, 84 F.3d 22, 26 (1st Cir.1996)
 
 
 [4]
 We "review the propriety of jury instructions for abuse of discretion." United States v. Mitchell, 85 F.3d 800, 809 (1st Cir.1996)
 
 
 [5]
 Shadduck further complains, for the first time, that the following comment about the weather caused the jury to hurry its deliberations:
 Now it's 3 o'clock in the afternoon. It's a pretty nasty afternoon in case you haven't been able to see the weather in the jury room. Counsel and I are willing to stay as long as you wish. What I normally do--and what I will do--is about 4 o'clock, I'll come down and I would normally excuse you at that time unless the jury or a majority, at least, of the jury believes that they are so close to completing the case that they'd like to stay a little bit longer. But if that's not the case, then I will excuse you to resume on Monday morning.
 There is nothing in this comment to suggest that the jury was pressured to rush its verdicts. Rather, the trial judge made abundantly clear that he was willing to remain as long as necessary that afternoon or to reconvene the following Monday. Moreover, the defense failed to object to this reasonable procedure.
 
 
 [6]
 Shadduck further claims, and the government concedes, that the presentence report ("PSR") initially "double counted" the $8,000 removed from the joint checking account the day the Shadducks filed for bankruptcy. Although the government claims that the error was corrected in an amended PSR, the record contains no PSR. In all events, any such double counting would have been harmless, since the total-loss category was unaffected. See U.S.S.G. § 2F1.1(b)(1)(I) (eight-level increase for loss exceeding $200,000 but less than $350,000). Thus, addressing the error, if any, could have no effect on the sentence. See United States v. Sepulveda, 15 F.3d 1161, 1199 (1st Cir.1993) (noting, in context of drug-quantity calculation, that "[i]t is unnecessary to address an allegedly erroneous sentencing computation if, and to the extent that, correcting it will not change the applicable offense level")
 
 
 [7]
 Bankruptcy Code § 541(c)(2) excludes from "property of the estate" an interest in a trust subject to transfer restrictions enforceable under applicable nonbankruptcy law. See Patterson v. Shumate, 504 U.S. 753, 757-58, 112 S.Ct. 2242, 2246-47, 119 L.Ed.2d 519 (1992). Patterson held that the antialienation provisions in ERISA-qualified plans constitute transfer restrictions for § 541(c)(2) purposes, hence such plans are not "property of the estate." Id. at 760, 112 S.Ct. at 2247-48. See also In re Yuhas, 104 F.3d 612, 614-16 (3d Cir.1997) (IRA funds not "property of estate"); In re Meehan, 102 F.3d 1209, 1214 (11th Cir.1997) (same). Not only was this argument not raised below, but there is no record evidence, see supra n. 1, that Shadduck's pension plan even contained transfer restrictions
 
 
 [8]
 Nor does the record on appeal indicate that this claim was preserved below. Shadduck contends that Mass. Gen. Laws ch. 235, § 34A, exempts pension plan funds which do not exceed seven percent of the debtor's total income within the five-year period preceding bankruptcy, and that Mass. Gen. Laws ch. 175, § 119A, exempts insurance policies under certain conditions. In any event, this argument proves too much
 
 
 [9]
 Shadduck seeks to supplement the record with "newly discovered evidence" which allegedly establishes that these monies were considered exempt by the bankruptcy court even though never claimed exempt. The supplemental submissions--a hearing transcript in which the bankruptcy judge took a matter under advisement, and a letter from counsel for the trustee suggesting that the bankruptcy court might find that the pension plan funds were not reachable by creditors--establish nothing of the sort. We simply note, therefore, that the so-called "evidence" would not have affected the outcome
 
 
 [10]
 The guideline interpretation underlying the district court ruling is reviewed de novo. United States v. Garcia, 34 F.3d 6, 10 (1st Cir.1994)
 
 
 [11]
 The application note provides in full:
 Subsection (b)(3)(B) provides an adjustment for violation of any judicial or administrative order, injunction, decree, or process. If it is established that an entity the defendant controlled was a party to the prior proceeding, and the defendant had knowledge of the prior decree or order, this provision applies even if the defendant was not a specifically named party in that prior case. For example, a defendant whose business was previously enjoined from selling a dangerous product, but who nonetheless engaged in fraudulent conduct to sell the product, would be subject to this provision. This subsection does not apply to conduct addressed elsewhere in the guidelines; e.g., a violation of a condition of release (addressed in § J.7 (Offense Committed While on Release)) or a violation of probation (addressed in § 4A1.1 (Criminal History Category)).
 (Emphasis added.)
 
 
 [12]
 We express no view regarding whether a departure might be based upon conduct that does not come squarely within U.S.S.G. § 2F1.1(b)(3)(B)
 
 
 [13]
 As the Ninth Circuit has noted:
 Clearly the false statement [the debtor] made in relation to his bankruptcy estate was intended to result in an undervaluation of the estate in bankruptcy and the availability of less money to satisfy the demands of the creditors. Thus, [the debtor] would have "obtained something of value from more than one person," that being whatever portion of the estate to which the creditors were entitled but which was hidden by the false statement.
 United States v. Nazifpour, 944 F.2d 472, 474 (9th Cir.1991) (per curiam). See also Michalek, 54 F.3d 325, 330 (7th Cir.1995) (concealing assets harms trustee and creditors).