UNITED STATES, Appellee,

v.

Robert J. ROWE, Defendant, Appellant.

No. 97–1703.

United States Court of Appeals,
First Circuit.

Heard Feb. 2, 1998

Decided May 8, 1998.

Stephen B. Hrones with whom Hrones & Garrity was on brief for appellant.

Mark J. Balthazard, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

On May 29, 1996, a grand jury indicted defendant-appellant Robert Rowe on three counts of bankruptcy fraud under 18 U.S.C. § 152. Count I charged him with fraudulently concealing his interest in a home construction business known as Elegant Design, Inc. ("EDI"). Counts II and III charged him with making false statements in two of the bankruptcy schedules attached to his chapter 7 bankruptcy petition. Following an eleven-day trial, a jury acquitted Rowe on Count I but convicted him on Counts II and III. Subsequently, the district court sentenced Rowe to 33 months in prison, but stayed execution of the sentence pending appeal.

Rowe claims an entitlement to a new trial on Counts II and III because the district court mishandled two situations precipitated by messages the court received from jurors during the trial. Alternatively, Rowe contends that the court erred in denying his Fed.R.Crim.P. 29 motion for a judgment of acquittal on Count III, in calculating the loss he intended to cause his creditors by perpetrating the frauds, and in imposing three upward adjustments to his offense level before determining the appropriate guidelines sentencing range. Finally, Rowe complains about the court's decision to keep confidential a letter it received from a juror after the verdicts but prior to sentencing. We affirm the conviction on Count II, reverse the conviction on Count III, and remand for resentencing.

## I.

We confine our factual recitation to those matters relevant to the disposition of Rowe's appeal, construing any disputed facts in a light most favorable to the verdicts. *See United States v. Wihbey*, 75 F.3d 761, 764 (1st Cir.1996).

### A. Rowe's False Statements

For years, Rowe and his brother, Ronald Rowe, ran a home construction business called Rowe & Rowe, Inc. ("RRI"). In 1989, Rowe and his brother suffered a number of serious financial setbacks. As a result, the brothers discontinued doing business as RRI, and Rowe caused another company he controlled, Senator Construction, Inc., to file for bankruptcy. That same year, the brothers created EDI. EDI, which was nominally owned by Howard "Sonny" Fisher, a friend of Rowe's, engaged in the same business as had RRI.

In September 1992, Rowe filed a personal bankruptcy petition under chapter 7 of the Bankruptcy Code. Doing so obligated him to file with the bankruptcy court a number of bankruptcy schedules that are designed to profile a chapter 7 petitioner's financial situation. In Schedule A, which directs the petitioner to list all interests in "REAL PROPERTY," Rowe typed "NONE" in the column where he was asked to provide a "Description and Location of Property." In Schedule J, which is labeled "CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S);" Rowe typed "$395.00" in the space he was to list his "Rent or home mortgage payment."

These two responses were the subjects of the bankruptcy frauds charged in Counts II and III of the indictment.

The government's theory as to Count II was straightforward: the answer "NONE" in Schedule A was fraudulent because, at the time Rowe filed his petition, he and his ex-wife each had a 50 percent ownership interest in a residence located at 20 Highland Avenue in Nahant, Massachusetts. The government's theory as to Count III is a bit more complicated, *see infra* at 15–22, but can be summarized as follows: the answer "$395.00" in Schedule J was fraudulent because, at the time Rowe filed his petition, EDI was paying upwards of $1800 per month in rent for Rowe to live in a house he personally had leased. This house was located at 47 Castle Road in Nahant, Massachusetts. In the government's view, Rowe had a clear obligation to disclose this rent payment on his Schedule J, but failed to disclose it in order to further the fraud charged in Count I (the charge of which the jury acquitted him): concealing his interest in EDI from the bankruptcy court.

Rowe defended the statement charged in Count II on the basis that, although he technically did own half of the Highland Avenue residence, he had no "beneficial interest" in it because it was encumbered with a $50,000 mortgage and attachments in the amount of $1.8 million, and because he had an agreement with his ex-wife that she would get the equity (if any) that remained in the residence following sale of the property. Rowe defended the statement charged in Count III on two bases: (1) because EDI was paying the $1800 monthly rental payment on the Castle Road property pursuant to a loan agreement Rowe had with the company, Rowe was not obligated to list the payment as a current personal expenditure; and (2) because Schedule J asked Rowe to list only his "rent *or* home mortgage payment" (emphasis supplied), and because Rowe's response of "$395.00" truthfully set forth his home mortgage payment, Rowe's answer to this (arguably) disjunctive inquiry was truthful. Rowe supported this latter argument by testifying that his monthly mortgage payment on the Highland Avenue property was $395.00 (not including late payment charges).

## B. Juror Communications

Three days into the government's case-in-chief, one of the jurors ("Juror A") contacted the court clerk and asked: "When we're polled, do we have to face each of the lawyers?" Presumably because a jury poll would only follow a conviction, Rowe's counsel was concerned that Juror A had already decided the case against his client and asked the district court to inquire into the matter. The court obliged by summoning the juror to the sidebar, telling him that he might not even be polled, and asking whether there was some particular reason he was interested in the polling process. Juror A responded: "No. I mean, I was just curious what—who does it and how it happens, when it happens, if it happens. I don't really know much about the courtroom." After the court pressed a bit further and asked why he was concerned about the polling process, the juror elaborated:

> Um, I don't know. I mean, if—I—I'm not really sure, but I know that—I mean, the way things are going, I don't know who—you know, how—I don't know. I mean, really—I don't really have an answer, but I feel that I'd like to know how the proceedings are going to end. I mean, I—yeah, I don't know how to—it's just a concern. That's all.

The court then asked Juror A whether his concern would "in any way impede or impair [his] impartial consideration of the case," and the juror assured the court that his evaluation of the case would be impartial.

After Juror A returned to the jury room, Rowe's counsel complained that the court had not asked him why he was concerned about *facing* the lawyers while being polled. The court then summoned the juror back to the sidebar and asked him why he harbored such a concern. Juror A responded: "Um, I don't know. It seemed like they're hard on the witnesses. That's what my question is. I mean, I don't know—you know, we can only go by the facts, so—you know, and we'll all know what those are." Subsequently, Rowe's counsel challenged Juror A for cause,

arguing that he was the only lawyer who had been hard on the witnesses to that point, that the juror's answers reflected both sympathy for the government's witnesses and a predisposition to convict, and that the juror's answers also demonstrated a disqualifying "mental[ ] deficien[cy]." The court rebuffed the challenge, finding no basis for an inference that Juror A had already made up his mind and observing that "[w]hen attorneys choose their method of dealing with witnesses, [they] do it in the presence of the jury, [they] take risks, [they] deliberately take those risks, and that . . . that there is some reaction to that is not a basis for a challenge for cause."

On the same day as the incident involving Juror A, a second juror ("Juror B") informed the court clerk that she wished to speak with the district court. In the presence of counsel, Juror B (an occupational health worker) told the court:

> I was talking to a co-worker last night at my job who was just filling in on my patients and I guess she was covering one of my patients. I had never talked about the case, but she knew I was at a federal criminal case and I'd be back in two weeks to go back to work. And I guess one of the patients she was covering, the family said: "Oh, I wonder if she's on the Rowe case." And when she told me that I said: "I can't discuss"—I said: "No, but I can't discuss any case that I'm doing," and that was it.

> And then—it wouldn't affect my impartiality, but I felt like I should report it.

The court then asked the juror if she could identify the patient by name, which she did. At this point, Juror B also told the court that she had treated the patient for about a week prior to being called for jury duty, and that she had never discussed anything with the patient other than her treatment. After Juror B returned to the jury room, Rowe's counsel informed the court that the patient in question was Rowe's current wife's grandmother. When the court asked all counsel present if they wanted it to probe further into the matter, they all declined the invitation.

Yet one week after the verdicts were returned, Rowe filed a motion for a new trial, alleging misconduct on the part of Juror B. Rowe claimed that, at the time of the events just described, Juror B knew that her patient was related to Rowe by marriage, but did not disclose her knowledge to the court. In support of this claim, Rowe submitted an affidavit from his wife to the effect that Mrs. Rowe had been present in the first row of the spectator section of courtroom throughout the trial; that, after the trial, Mrs. Rowe had happened upon Juror B in her grandmother's room; that Juror B had expressed no surprise at seeing Mrs. Rowe; that, when Mrs. Rowe asked Juror B if she knew her, the juror replied that "she was not sure;" that when Mrs. Rowe identified herself, Juror B said that "she really didn't know" her; and that Mrs. Rowe had learned after the *first* day of trial (and therefore prior to the juror's disclosure to the court) that the juror had been caring for her grandmother. Rowe also asked the district court to call Juror B in for further questioning.

The district court held a hearing on Rowe's motion, during which it asked Rowe's counsel why, prior to the verdicts, counsel had elected not to have the court question Juror B about whether she knew of the relationship between Rowe and her patient. Rowe's counsel replied that doing so would have been "dangerous" because "[o]nce that question was asked, she would have been off the jury." When the court asked why, Rowe's counsel explained that the way he would have had to ask the question—"Do you realize that your patient is the grandmother of the wife of the defendant?"—would have tainted the juror by informing her of the nature of the relationship. The court disagreed, opining that Juror B would have been disqualified only if knowing the nature of the relationship would somehow have precluded her from "sit[ting] fairly and impartially on the issues in this case." Following a continuance and after hearing from the co-worker who initially had asked Juror B if she was sitting on the Rowe case, the court declined to call the juror in for questioning and denied Rowe's motion. In explaining its ruling, the court observed that a contrary ruling would create incentives for defense counsel to pursue mat-

ters of juror misconduct "only after having waited to see whether the jury verdict was favorable or unfavorable."

The final juror communication appears to have occurred after the verdicts but prior to sentencing. Following the imposition of sentence at the sentencing hearing, Rowe's counsel asked the court why it had not placed into the record a letter that the court had received from a juror ("Juror C") after the verdicts had been returned. Counsel did not reveal how he had learned of the letter; he did, however, evince some familiarity with its contents, asserting that it was relevant to sentencing. Counsel then asked the court to make the letter, and the court's response to the letter, a part of the record. Analogizing to cases prohibiting counsel from communicating with jurors after a trial, *see, e.g., United States v. Kepreos,* 759 F.2d 961, 967 (1st Cir.1985), the court declined his request "because it is not the function of a juror to be concerned with the sentencing function." Without divulging the letter's contents, the court also stated that Juror C's views "were not considered by me as relevant [to sentencing] in any respect."

## C. The Sentence

Because our reversal of Rowe's conviction on Count III vitiates the district court sentence and requires resentencing, *see infra* at 21–22, we simply sketch the lower court's sentencing calculations for purposes of placing the remainder of this appeal into context.

There was no dispute that each count of conviction carried with it a base offense level of six. *See* U.S.S.G. § 2F1.1(a). The district court increased this level by seven because it found by a preponderance of the evidence that Rowe intended to deprive his creditors of somewhere in excess of $120,000 when he engaged in the conduct underlying his two convictions. *See* U.S.S.G. § 2F1.1(b)(1)(H) and (I) (directing sentencing courts to increase the base offense level by seven if the loss caused was more than $120,000 but less than or equal to $200,000); *see also* Application Note 7 to U.S.S.G. § 2F1.1 (directing sentencing courts to use intended loss if intended loss is greater than actual loss); Application Note 8 to U.S.S.G. § 2F1.1 (noting

that loss determinations need not be made with precision). The court then made the following upward adjustments to Rowe's offense level: two levels for obstructing justice, *see* U.S.S.G. § 3C1.1; two levels for violating a judicial process or order, *see* U.S.S.G. § 2F1.1(b)(3)(B); and two levels for more than minimal planning, *see* U.S.S.G. 2F1.1(b)(2)(A). These adjustments yielded a total offense level of 19 and, because Rowe's criminal history category was I, a guidelines sentencing range of 30–37 months. The court then imposed the 33–month sentence that is, in part, the subject of this appeal.

## II.

As noted at the outset, Rowe contends that the district court's mishandling of each of the incidents involving Jurors A and B provides an independent basis for granting him a new trial on Counts II and III. Rowe also renews his two arguments regarding the legal deficiency of Count III, and challenges the legality of the intended loss determination and of the three upward adjustments the court made to his base offense level. Finally, though failing to suggest an appropriate remedy therefor, Rowe takes general issue with the court's failure to place the letter from Juror C, and its response to the letter, in the record. We address each argument in turn.

## A. The Incidents Involving Jurors A and B

Rowe contends that the district court committed reversible error in denying his mid-trial motion to strike Juror A for cause. On appeal, he has abandoned his argument that Juror A lacked the mental capacity to sit on the case; but he continues to contend that Juror A's "hard-on-the-witnesses" comment demonstrates that the juror was prejudiced against his lawyer, and that the entire episode shows that the juror had decided to convict prior to hearing all the evidence. "Why," Rowe asks, "would a juror not want to look a defense attorney in the face if he had just acquitted his client?" We see no reversible error in the district court's rejection of Rowe's arguments.

In cases involving possible juror misconduct or bias, the district court acts

with broad latitude in determining the nature and scope of the inquiry it will conduct into the matter. *See, e.g., United States v. Walsh,* 75 F.3d 1, 7 (1st Cir.1996). Any findings the court makes as a result of such an inquiry will stand unless shown on appeal to be clearly erroneous, *see, e.g., United States v. Ortiz–Arrigoitia,* 996 F.2d 436, 443 (1st Cir.1993), and we will not intervene unless the trial court's denial of a cause-based challenge to a juror constitutes a "clear abuse," *United States v. McNeill,* 728 F.2d 5, 10 (1st Cir.1984).

Here, there was no such abuse with respect to Rowe's challenge to Juror A. Accepting solely for the sake of argument the factual and legal premises of Rowe's first contention—that Juror A's apprehension about facing the lawyers during polling was a direct response to *Rowe's* lawyer's style of interrogation, and that a defendant is entitled to strike for cause a juror who becomes prejudiced against him because of his lawyer's courtroom conduct—we nevertheless think the court acted well within its discretion in declining to strike Juror A. The most that can be said about Juror A's sidebar comments is that they reflected concern about Rowe's counsel's style of interrogation and, perhaps, about being on the receiving end of such aggressive questioning. In our view, it simply stretches matters too far to infer from this that Juror A had become so "prejudiced" against Rowe's counsel that he had prejudged the case against Rowe. Our conclusion in this respect is bolstered by the fact that, at the conclusion of the first sidebar conference, the district court sought and received assurances from Juror A that the juror was and would remain an impartial juror.

Rowe's more general argument—that Juror A would not have been concerned about the jury poll at all unless he had already decided to vote guilty—similarly rests more on speculation than on compelled inference. To say that Juror A's having prefaced his question to the court with the phrase "[w]hen we're polled" is indicative of an already-made decision to convict would require us to ignore the larger context: that the juror, by his own subsequent admission, "[didn't] really know much about the courtroom" (meaning that he presumably didn't know that a jury poll only follows conviction). It also would require us to reject as untruthful Juror A's subsequent statement that he was and would be an impartial juror, even though the trial judge, after pointed questioning, came to the opposite conclusion. The applicable standard of review precludes such an outcome.

To be sure, it is fair to assume from Juror A's question that the *possibility* of conviction (and, derivatively, a potentially unpleasant encounter with Rowe's lawyer) was on the juror's mind prior to the conclusion of the case. Of course, many jurors may contemplate the possibility of conviction, and the unpleasantness it entails, as they listen to the evidence in a criminal case. But without more, evidence that a juror is feeling apprehension about the anticipated courtroom dynamics as the verdicts are returned is not to be taken as evidence that the juror has prejudged the case. Nor, obviously, does such evidence constitute a proper basis for striking the juror.

▮ The district court's handling of the incident involving Juror B is also beyond reproach. As we read the record, Rowe's complaint concerning Juror B is governed by the rule that "a defendant's failure to raise a claim of juror bias until after trial, when the issue of potential bias was known by the defendant during trial, amounts to a waiver of the claim." *United States v. Costa,* 890 F.2d 480, 482 (1st Cir.1989). Rowe knew at the time Juror B came forward that the juror had been caring for his wife's grandmother. Yet he declined to have the court ask Juror B whether she knew of the relationship between her patient and himself. Rowe must now live with the consequences of his decision.

Rowe's challenge to this line of reasoning—that he was placed in an untenable situation because further inquiry into the matter necessarily would have disclosed the nature of the relationship between Juror B's patient and himself—is anchored upon a false assumption. Further inquiry would not necessarily have disclosed the nature of the relationship; it quite obviously could have proceeded by means of a non-leading

question such as "Do you know of any connection between your patient and the defendant?" In view of this, the anti-sandbagging rationale for our waiver rule would appear to apply to this case with special force. *See Costa,* 890 F.2d at 482 ("Any other rule would allow defendants to sandbag the court by remaining silent and gambling on a favorable verdict, knowing that if the verdict went against them, they could always obtain a new trial by later raising the issue of juror misconduct.").

### B. The Challenge to Count III

As we have stated, Rowe contends that the district court erred in denying his Fed.R.Crim.P. 29 motion for a judgment of acquittal on Count III. Rowe's claims of error mirror those presented below: (1) because EDI was, in fact, paying the monthly rent on the Castle Road residence, Rowe was not obligated to list the payment as a current personal expenditure; and (2) because Schedule J uses the disjunctive in asking a chapter 7 petitioner to list "Rent or home mortgage payment," he was within his rights to list either one or the other, but not both. Although he does not say so explicitly, Rowe's arguments on this point appear to derive from the rule that, in a false statement prosecution, an answer to a question is not fraudulent if there is an objectively reasonable interpretation of the question under which the answer is not even false. *Cf. United States v. Bradstreet,* 135 F.3d 46, 51–52 (1st Cir.) (endorsing, in a securities fraud case, the reasoning of *United States v. Migliaccio,* 34 F.3d 1517, 1522–25 (10th Cir.1994), to this effect), *cert. denied,* — U.S. —, 118 S.Ct. 1805, 140 L.Ed.2d 944 (1998).

The latter of Rowe's two arguments is not easily decided. Working against Rowe are the facts that Schedule J quite clearly seeks a snapshot view of a chapter 7 petitioner's current expenditures, and that when a chapter 7 petitioner lists on Schedule J only a rent payment (or a home mortgage payment) though he or she actually has *both* a monthly rent payment *and* a monthly home mortgage payment, the petitioner would appear to frustrate, in quite an obvious way, the primary purpose of the schedule. In view of this, and in the absence of any other line on Schedule J which clearly applies to payments of this sort, *but see infra* at 20 (noting the potential applicability of the line asking for "Installment payments" other than automobile payments), we think the line asking for a petitioner's "Rent or home mortgage payment" might reasonably be regarded as a shorthand version of the following imperative: "List here your total monthly payment ascribable to all rent or mortgage obligations." So also do we see as potentially relevant the authority, in this circuit and elsewhere, for construing the conjunction "or" to mean "and" in a statute (even a penal statute) where the clear purpose of the statute requires such a construction. *See United States v. Scivola,* 766 F.2d 37, 45 (1st Cir.1985) (reading 18 U.S.C. § 1623(d) to preclude a perjury prosecution against a person who has recanted perjurious testimony only if the testimony "has not substantially affected the proceeding" in which it was given, *and* if "it has not become manifest that [the] falsity [of the testimony] has been or will be exposed"); *see also, e.g., United States v. Fornaro,* 894 F.2d 508, 510–11 (2d Cir.1990) (same); *United States v. Moore,* 613 F.2d 1029, 1039–45 (D.C.Cir.1979) (same); *but see United States v. Smith,* 35 F.3d 344, 346–47 (8th Cir.1994) (disagreeing with *Fornaro* and similar cases and giving effect to the plain language of the statute).

Yet there are considerations working in Rowe's favor as well. When a question asks for "x *or* y" in such a way as to suggest an assumption that only x or y pertains, to respond only "x" or only "y" when, contrary to the question's assumption, *both* x *and* y pertain would arguably not be false (though it might be misleading). To illustrate by means of an imperfect analogy, answering "President" to the question "Was Gerald Ford President or Vice–President?" might be misleading; but it would arguably not be criminal under a statute that penalizes only "false" statements (as 18 U.S.C. § 152 does). Also potentially relevant and weighing in on Rowe's side are the principles undergirding the rule of lenity, *see, e.g., Dunn v. United States,* 442 U.S. 100, 112, 99 S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979) (noting that the rule "is rooted in fundamental principles of due

process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited"), and that the government, to our surprise, has all but conceded that Rowe's argument would have force but for the following three facts: (1) the question asked for Rowe's *"home* mortgage" payment (emphasis supplied); (2) the Highland Avenue residence was not Rowe's home; and (3) in any event, "Rowe offered no other evidence, either in the form of witnesses or documents[,] to support his testimony that the mortgage amount was $395 per month. Government's Brief at 38.[1]

■ Although we ultimately do not rule on the merits of Rowe's second argument because we agree with his first, *see infra* at 20–22, we believe it important to note our dissatisfaction with the government's substantive response to the second argument. We are quite perplexed at the government's insistence that *Rowe's* failure to introduce evidence corroborating his testimony as to his monthly mortgage payment constitutes sufficient proof (in conjunction with the evidence of the apparently minimal inexactitude of the $395 figure, *see supra* note 1) for the jury to have found beyond a reasonable doubt that Rowe's $395 answer fraudulently misrepresented his actual monthly mortgage payment on the Highland Avenue property. To the extent that the government can be seen to have proceeded under an alternative theory that, even if Rowe was not obliged to list the rental payment on the Castle Road property, his response to Schedule J's request for his "Rent or home mortgage payment" was fraudulent because $395 was *not his actual* monthly mortgage payment, *but see* Indictment at ¶¶ 19–22 (failing even to hint at such an alternative theory), the government bore the burden of proving the falsity of Rowe's answer beyond a reasonable doubt, *see Bradstreet,* 135 F.3d at 52. And the absence of

evidence corroborating Rowe's oral testimony (even when taken with the other "evidence" on this point, *see supra* note 1) is quite plainly insufficient to ground such a finding.

We also are troubled by the government's argument that Schedule J requests only a *"home* mortgage payment" and that the mortgage payment Rowe listed did not pertain to his "home"—i.e., to the "place where [Rowe] live[d]." Government's Brief at 39. In expressing some doubt about the persuasiveness of Rowe's second argument, we already have observed that failing to list the sum total of *all* rent and mortgage payments on Schedule J's "Rent or home mortgage payment" line would seem to counteract the purposes of the schedule. *See supra* at 20–21. We acknowledge that there is room for debate on this point; one might plausibly argue that a mortgage payment pertaining to a property which does not constitute petitioner's residence is more appropriately listed in the space provided on Schedule J for "Installment payments" other than automobile payments. But the government has not argued that mortgage payments pertaining to non-residential properties should be recorded elsewhere on Schedule J. Instead, it has merely asserted, without limitation, that a chapter 7 petitioner who, acting within the spirit (if not the letter) of Schedule J, includes such a mortgage payment on the "Rent or home mortgage payment" line concomitantly provides "an answer to the question in the bankruptcy form [that is] not true." Government's Brief at 39. In our view, this argument fails to see the forest for the trees.

■ In any event, the fraud alleged in Count III, and the government's overriding theory as to Count III, has not been Rowe's

---

1. With respect to Rowe's failure to support his testimony that his mortgage payment was $395 per month, the government made two additional points in its brief: (1) Mary Rowe (Rowe's ex-wife) testified that she thought Rowe's monthly mortgage payment "was about $500 per month"; and (2) "Rowe conceded under cross-examination that the mortgage amount varied and during the month before his bankruptcy he paid $415." Government's Brief at 37–38. To our disap-

pointment, however, the government did not note that Rowe's "concession" was accompanied by Rowe's unrebutted explanations that the $415 payment included a late fee and that other minimal ($20) monthly variations were due to periodic changes in "the taxes and the escrow amount." Nor did it in any way acknowledge the nearly non-probative nature of Mary Rowe's ballpark estimation.

listing of his mortgage payment; it has been Rowe's failure to list the monthly rental payment for the Castle Road property EDI was making on his behalf. And on this point, the government really has no answer to Rowe's argument that, *precisely because* EDI was making the payment (a fact which the government not only concedes, but in fact charged in the indictment, *see* Indictment at ¶ 21), Rowe's failure to list it as a current personal monthly expenditure was not bankruptcy fraud. The government may well be correct in asserting that Rowe filled out Schedule J as he did because he wished to keep his relationship with EDI a secret. So too may it be correct in contending that Rowe's listing of the Highland Avenue mortgage payment was disingenuous, as evidenced by both Rowe's failure to list the mortgagee of the Highland Avenue property as a creditor elsewhere on his schedules and the strong likelihood that EDI funds also were used to make the mortgage payments. But that does not make the failure to list the rental payment a crime, as the indictment charged. Schedule J is directed at ascertaining the "CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)." And in our view, an objectively reasonable interpretation of that which constitutes a current expenditure of an individual debtor *excludes* expenditures of non-debtor assets by a third party to benefit a debtor (even expenditures for which repayment would eventually be sought, as apparently was the case here). *See Bradstreet*, 135 F.3d at 51–52; *cf.* 5 Collier on Bankruptcy ¶ 547.03[2] (15th ed. 1997) ("When a third person makes a loan to a debtor specifically to enable that debtor to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets.... The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the

creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim...."); *Brown v. First Nat'l Bank,* 748 F.2d 490, 491–92 (8th Cir.1984) (similar).[2] Thus, the district court erred in denying Rowe's Fed. R.Crim.P. 29 motion for a judgment of acquittal on Count III.

### C. Sentencing Issues

■ A review of the Memorandum of Sentencing Hearing and Report of Statement of Reasons ("Statement of Reasons") reveals that the district court relied heavily on the conduct underlying Count III in determining the loss to creditors Rowe intended to cause, and that Rowe obstructed justice and engaged in more than minimal planning. It is therefore clear that we must vacate Rowe's sentence and remand the cause for a second sentencing hearing. On remand, we urge the court, if it should again deem an upward adjustment appropriate for violation of a judicial order under U.S.S.G. § 2F1.1(b)(3)(B), to specify which order of the Bankruptcy Judge and/or the Clerk of the Bankruptcy Court Rowe violated by engaging in the conduct underlying Count II (the lone remaining count of conviction). *Cf.* Statement of Reasons at 3.[3] We also urge the court, should it again impose an obstruction of justice enhancement, to explain how any obstructive conduct relates to the conduct underlying Count II. *Cf. id.* at 2.

### D. The Incident Involving Juror C

The incident involving Juror C raises the unusual issue of the nature of a trial court's obligation (if any) to share with trial counsel a post-verdict communication from a juror. Proper resolution of this issue is not at all straightforward. On the one hand, the analogy the district court drew to our cases

---

**2.** Along these lines, we note that, although there was evidence that Rowe exercised extraordinary control over EDI funds and made improper use of EDI funds, the government did not seek to prove in connection with Count III that EDI was an *alter ego* of Rowe.

**3.** Because of the potential availability of an independent basis for this enhancement, we do not at this time decide whether an enhancement is appropriate in all cases of bankruptcy fraud involv-

ing the concealment of a debtor's assets. *See United States v. Saacks,* 131 F.3d 540, 543–46 (5th Cir.1997) (summarizing the law and approving of application of the enhancement in such circumstances); *but cf. United States v. Shadduck,* 112 F.3d 523, 531 (1st Cir.1997) (acknowledging the point of view represented in *Saacks* but stating that the matter "is not free from doubt").

prohibiting counsel from communicating with jurors after a trial, *see, e.g., Kepreos,* 759 F.2d at 967, is far less than perfect because it was a *juror,* and not counsel, who initiated the post-trial communication at issue here. Moreover, by failing to make the letter part of the record, the court effectively made itself the final word as to whether the letter revealed anything that could call the legality of the verdicts into question. Finally, the fact that the court also received two rather unorthodox communications from jurors prior to the verdicts raises questions about whether the court properly exercised any discretion it might have had with respect to this situation.[4] In our view, there is much to be gained (and little we can see to be lost) in providing Rowe with concrete evidence that Juror C's concerns were, for example, entirely unrelated to the issues raised by Jurors A and B.

There are, on the other hand, also countervailing considerations. Despite knowing about the letter prior to sentencing, Rowe's counsel precluded any opportunity for reflective consideration of the matter by waiting until *after* the sentence was imposed even to raise it. Furthermore, at oral argument before us, Rowe's counsel conceded that he "had some vague idea" about the contents of the letter, which apparently was, at least in part, a plea for leniency at sentencing. All this leads us to conclude that there may well be less of a controversy on this issue than is first apparent.

In any event, we think it best at this point simply to leave this matter for further argument and record development following remand. Especially in view of the communications from Jurors A and B, we are hard-pressed to see how keeping the letter from Juror C out of the record would be within any discretion the district court might have on this issue. But if, on further reflection, the court sees compelling factual and/or legal reasons which both outweigh the very strong interests Rowe has in reviewing the letter and render inadequate the measures at the

court's disposal for ensuring jury and juror confidentiality, the court should state those reasons with particularity to facilitate any further review we may be called upon to conduct.

### IV.

For the reasons stated, we **affirm** Rowe's conviction on Count II, **reverse** Rowe's conviction on Count III, and **vacate** and **remand** for resentencing.

---

4. In questioning whether, as a matter of discretion, the court should have kept the letter from Juror C out of the record, we note that the court did not explain why the measures it might have taken to ensure confidentiality—e.g., sealing the

document and ordering trial counsel to keep its contents confidential—would have been insufficient to protect any possible interests favoring non-disclosure.