In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2046

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AARON MICHAEL LINZY, SR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 08-CR-40009—**Michael M. Mihm**, *Judge.*

ARGUED FEBRUARY 26, 2010—DECIDED APRIL 27, 2010

Before FLAUM and WOOD, *Circuit Judges*, and ST. EVE, *District Judge.*[1]

ST. EVE, *District Judge.* On January 29, 2008, a federal grand jury indicted Defendant Aaron Michael Linzy, Sr. and his co-defendant Jarvell Jones with one count of

---

[1] The Honorable Amy J. St. Eve, District Judge for the United States District Court, Northern District of Illinois, sitting by designation.

conspiracy to distribute various controlled substances, namely, crack cocaine, methylenedioxy-methamphetamine (ecstasy), and marijuana (Count I), and one count of unlawful possession with intent to distribute crack cocaine, ecstasy, and marijuana (Count II). *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A, C, D), 846. On October 15, 2008, a jury convicted Linzy on both counts of the Indictment, and on April 17, 2009, the district court sentenced Linzy to a term of life imprisonment on both counts, to run concurrently, ten years' supervised release, and a $200 special assessment. On appeal, Linzy challenges his conviction arguing that the district court abused its discretion in restricting defense counsel's cross-examination of his co-defendant Jones.[2] We affirm the district court.

## FACTUAL BACKGROUND

In early 2007, Linzy and two other men, Deshawn Hemphill and Marquis Gentry, lived in an apartment in Charles City, Iowa from which they sold crack, ecstasy, and marijuana. In April 2007, Jarvell Jones, who was living in Elgin, Illinois, contacted Hemphill and said he needed to get out of the Chicago area because there was

---

[2] In his appellate brief, Linzy also challenged the district court's denial of his motion to suppress evidence. At oral argument, defense counsel conceded that the district court's decision under the circumstances was proper under *Illinois v. Caballes*, 543 U.S. 405, 409, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005).

a warrant for his arrest on first-degree murder charges. At Hemphill's suggestion, Jones joined Hemphill, Gentry, and Linzy in the Charles City apartment and soon started selling drugs with them. Jones' girlfriend, Jasmine Spates, also moved into the Charles City apartment later that year.

Linzy, Hemphill, Gentry, and Jones worked in shifts selling drugs. Together, the four men sold about 63 grams or 1/16 of a kilogram of crack a week. When their crack supply was running low, Hemphill contacted his crack supplier, a man named "Kane," who lived in Maywood, Illinois, a suburb of Chicago, to obtain another "63". Because Linzy was the only one in the group with a driver's license, he often traveled to Maywood to pick up the crack.

In early November 2007, Jones went to Chicago for a friend's birthday. While he was there, Jones purchased ecstasy and marijuana to take back to Iowa. On November 6, 2007, Hemphill called Jones in Chicago informing him that Linzy was coming to Chicago to "cop some" and that Jones could ride back to Iowa with Linzy. Around 10:30 p.m. on November 6, 2007, Linzy, accompanied by Jones' girlfriend Spates, arrived in Chicago and picked up Jones at the house where he was staying. They then drove to Kane's house in Maywood. Upon arrival, Linzy and Jones went into the house where Linzy paid Kane approximately $1,200 and received a quantity of crack from him. After going to Kane's house, Linzy, Jones, and Spates made another stop in Chicago where Jones picked up a red suitcase that contained his

clothes, along with the ecstasy and marijuana that Jones previously had purchased. Thereafter, Linzy put the crack in Jones' red suitcase, which was in the trunk of Linzy's silver Cadillac. Linzy, Jones, and Spates then began to drive back to Iowa.

At about 1:30 a.m. on November 7, 2007, while driving westbound on Interstate 80 in Rock Island County, Illinois, State Trooper Jared Steen observed a silver Cadillac with Iowa license plates improperly crossing over a lane line in violation of Illinois law. Trooper Steen followed the Cadillac because he was concerned the driver might be under the influence of alcohol. He also activated his in-vehicle video camera and used his on-board computer to run the silver Cadillac's registration information. From his computer inquiry, Trooper Steen learned that the Cadillac was registered to Linzy, who lived in Charles City, Iowa. Trooper Steen also learned that Linzy had a valid Iowa driver's license, but that his driving privileges in Illinois had been suspended.

As Trooper Steen continued to follow the silver Cadillac, he saw it improperly cross over the line separating the driving lane from the passing lane for a second time. At that point, Trooper Steen turned on his emergency lights and initiated a traffic stop. After the Cadillac pulled over, Trooper Steen approached the driver who identified himself as Linzy. Trooper Steen then saw that the Cadillac had two passengers, a woman in the front and a man in the back. Thereafter, Trooper Steen asked Linzy for his driver's license and registration. Linzy provided Trooper Steen with the

requested documents and answered Trooper Steen's questions "in an almost frantic manner."

After he obtained Linzy's driver's license and registration, Trooper Steen returned to his squad car, radioed his headquarters, and confirmed that Linzy's Illinois driving privileges had been suspended. Trooper Steen went back to the Cadillac, arrested Linzy for driving on a suspended license, and placed him in the back of the squad car. Trooper Steen asked Linzy if either of his passengers had a driver's license. Linzy answered that they did not and then Trooper Steen spoke to the passengers. The woman identified herself as Jasmine Spates. The man, who was later determined to be Jarvell Jones, identified himself as "Deeric Mosley." Neither Spates nor "Mosley" had a driver's license. Because neither passenger could drive Linzy's car, Trooper Steen called another trooper for assistance to transport the passengers from the roadside. Trooper Steen also called for a tow truck.

Approximately fifteen minutes later, Trooper Dan Erickson, who was a K-9 handler, arrived at the scene to assist with transporting the passengers. Troopers Steen and Erickson decided to have Erickson's dog, who was certified to detect the odor of drugs, conduct a "free air sniff" of Linzy's car. At the car's trunk, the dog alerted to the presence of drugs. Trooper Steen then searched the trunk and found the red suitcase containing crack, ecstasy, and marijuana.

On June 11, 2008, Jones pleaded guilty to the conspiracy charge in Count I of the Indictment pursuant to

a plea agreement. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the government agreed to cap Jones' sentence at the mandatory minimum sentence of 20 years. In return, Jones agreed to cooperate fully with the government, including to testify at Linzy's trial. Before trial, Linzy moved in limine to impeach Jones with his use of the alias "Deeric Mosley" and with the fact that he had an active arrest warrant and a pending first-degree murder charge in Cook County, Illinois. The district court ruled that Linzy could question Jones about the alias, but could only refer to the pending murder charge as a "very serious felony charge."

At Linzy's jury trial, Jones testified that he had pleaded guilty to participating in a federal drug conspiracy and that pursuant to his plea agreement, he agreed to cooperate with the government. Jones further testified that he called Hemphill in Iowa in April 2007 because he had an active arrest warrant and was trying to get out of Chicago. Jones admitted that he sold drugs in Charles City, Iowa starting in April 2007 and that he sold drugs with Linzy. In addition, Jones testified that Kane, who lived in the Chicago suburb of Maywood, supplied their crack. He further stated that his source for ecstasy was in Chicago.

Moreover, on direct examination, Jones conceded that he smoked marijuana every day and used ecstasy and drank alcohol on the weekends or special occasions. He further admitted to using PCP (phencylidine) during the November 2007 weekend in Chicago before he was arrested. Jones stated that his drug use did not affect

his ability to testify. He also testified that he had a prior felony conviction for possession of a controlled substance. In addition, Jones explained the details leading up to his and Linzy's arrest, admitting that he gave Illinois State Trooper Steen the false name, Deeric Mosley. He also testified that he had an outstanding warrant for a "serious felony offense back in Chicago" and that this was a separate case from the federal drug case. Jones was not promised and did not expect any benefit as part of his cooperation deal with the government in connection with this "serious felony offense."

On cross-examination, defense counsel questioned Jones about his 2002 felony offense of a controlled substance in Cook County, to which he pleaded guilty and was sentenced to probation. Counsel specifically questioned Jones about using and selling drugs while he was on probation to which Jones admitted. Defense counsel also questioned Jones about his guilty plea to the conspiracy charge, including the sentencing cap at the mandatory minimum of 20 years. In addition, defense counsel impeached Jones about his drug and alcohol use because he told the United States Probation Officer that he had used different amounts of drugs than what he testified to on direct examination. Furthermore, when defense counsel asked Jones why he did not turn himself in when there was a warrant out for his arrest on a very serious felony charge, Jones replied that he did not want to go to jail. Counsel also questioned Jones about his alias, and Jones explained that Deeric Mosley was his cousin. Jones conceded that he gave Trooper Steen a false name and date of birth because he wanted to

avoid being arrested on the outstanding warrant. Jones further admitted that when he first decided to cooperate with federal law enforcement officers, he gave the alias Deeric Mosley to the officers. Finally, Jones admitted on cross-examination that he was a truthful person "sometimes."

**ANALYSIS**

On appeal, Linzy challenges the district court's restriction of Jones' testimony and cross-examination regarding his active arrest warrant for first-degree murder charges in Cook County. Linzy specifically argues that Jones was a material government witness whose testimony was essential to the government's case, and thus the defense theory required that counsel attack Jones' credibility "with every weapon at hand."

A criminal defendant's right to confront witnesses is a fundamental right essential to a fair trial as guaranteed by the Sixth Amendment's Confrontation Clause. *See Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Pointer v. Texas,* 380 U.S. 400, 403-04, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Under the Sixth Amendment's Confrontation Clause, a district court must allow effective cross-examination. *See Davis v. Alaska,* 415 U.S. 308, 317, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) ("We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionality protected right of cross-examination."). "[W]hen deciding whether limits on cross-examination are permissible, we must first distin-

guish between the core values of the Confrontation Clause and more peripheral concerns which remain within the trial court's ambit." *United States v. Reyes*, 542 F.3d 588, 593 (7th Cir. 2008). "If the 'core values' of the Confrontation Clause remain intact, we merely ensure that the district court's exercise of its wide discretion in limiting cross-examination was not abusive." *Id.*; *see also United States v. Recendiz*, 557 F.3d 511, 530 (7th Cir. 2009) ("A judge has broad discretion to place reasonable limits on cross-examination, based on concerns of, *inter alia*, confusion of the issues and relevance."). In determining whether the district court abused its discretion by limiting cross-examination, we must examine whether the jury had sufficient details about the witness to assess the witness' motives and biases. *See Recendiz*, 557 F.3d at 530-31. On the other hand, where the limit imposed on cross-examination implicates the core values of the Confrontation Clause, we review the limitation *de novo. See id.* at 530; *United States v. Khan*, 508 F.3d 413, 418 (7th Cir. 2007).

In *Recendiz*, we explained that "[o]ne such core value is the ability to expose a witness's motivation for testifying, his bias, or his possible incentives to lie," but "once a trial court permits a defendant to expose a witness's motivation, 'it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury.'" *Id.* at 530 (citation omitted). We further explained that the "right to confrontation is not implicated where 'limitations on cross-examination did not deny the defendants the opportunity to *establish* that the witnesses may

have had a motive to lie; rather, the limitations denied them the opportunity to *add extra detail* to that motive.'" *Id.* (emphasis in original, citation omitted). In other words, "the Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Kentucky v. Stincer,* 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (citing *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam) (emphasis in original)).

Here, defense counsel conceded that we would have to extend *Davis* and its progeny to find the core values of the Confrontation Clause at issue. We are not willing to do so given the peripheral concerns implicated by the limitation. Based on Jones' trial testimony, Linzy's counsel was given ample opportunity to establish Jones' motivation for lying and to attack Jones' credibility. *See Davis,* 415 U.S. at 317. In particular, defense counsel questioned Jones about his 2002 felony offense for possession of a controlled substance in Cook County to which he pleaded guilty. Defense counsel further questioned Jones about using and selling drugs, his guilty plea in the present matter, his use of an alias, and the warrant for his arrest concerning a "serious felony offense back in Chicago." The specific nature of the felony, namely, first-degree murder, may have added "extra detail" to Jones' motive to lie, but its omission did not deprive Linzy of his opportunity to effectively cross-examine Jones. *See Stincer,* 482 U.S. at 739; *Recendiz,* 557 F.3d at 530. Defense counsel throughly cross-examined

Jones. Because the jury had abundant evidence to appraise Jones' motivation for testifying, the district court did not abuse its discretion in limiting Jones' cross-examination concerning the nature of his arrest warrant. *See Recendiz,* 557 F.3d at 530-31. In sum, "there was no shortage of cross-examination exposing [Jones'] motive to lie." *United States v. McLee,* 436 F.3d 751, 762 (7th Cir. 2006).

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.