**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-4821

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JENNIFER MICHELLE LONGWELL, a/k/a Jennifer Michelle Hughart,

Defendant - Appellant.

Appeal from the United States District Court for the Southern District of West Virginia, at Parkersburg. Robert C. Chambers, District Judge. (6:08-cr-00243-1)

Argued: September 23, 2010          Decided: February 3, 2011

Before NIEMEYER and KEENAN, Circuit Judges, and Jerome B. FRIEDMAN, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Nicole Nicolette Mace, THE MACE FIRM, Myrtle Beach, South Carolina, for Appellant. Thomas Charles Ryan, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. **ON BRIEF:** Charles T. Miller, United States Attorney, Charleston, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This criminal appeal presents two issues for our consideration: 1) whether the district court erred in denying the defendant's motion for a mistrial, and 2) whether the district court erred in calculating the defendant's advisory Sentencing Guidelines range.

A jury convicted the defendant, Jennifer M. Longwell, on one count of concealment of assets in connection with a pending bankruptcy case, in violation of 18 U.S.C. § 152(1), and two counts of making false statements in connection with a bankruptcy case, in violation of 18 U.S.C. § 152(2). The district court sentenced Longwell to forty-one months imprisonment.

For the reasons set forth below, we hold that the district court did not err in denying Longwell's motion for a mistrial or in applying the Sentencing Guidelines. Accordingly, we affirm Longwell's convictions, as well as the sentence imposed by the district court.

I.

Longwell, a licensed real estate broker, opened her own mortgage brokerage business, Global Home Loans and Finance Company ("Global Home Loans"), in 2002. Longwell filed a Chapter 7 bankruptcy petition in the United States Bankruptcy

2

Court for the Southern District of West Virginia on February 25, 2005. In the petition, Longwell stated that she owned three properties. The first, located on Highland Avenue in Williamstown, West Virginia, was Longwell's personal residence. The remaining two, located on West 4th Street in Williamstown, West Virginia, and on Mary Street in Parkersburg, West Virginia, were designated as rental properties. At trial, Timothy King testified that Longwell agreed to sell him both rental properties in late 2004.

On March 2, 2005, Longwell sold the West 4th Street property to King for its appraised value of $101,500.[1] King obtained the mortgage to purchase the property from Longwell's company, Global Home Loans. At closing, Longwell produced the payoff statement for the Mary Street property. As a result, the closing attorney, Ralph Wilson, mistakenly used the proceeds from the West 4th Street sale to pay off Longwell's Mary Street mortgage.[2] Consequently, King took possession of the West 4th Street property subject to his own mortgage, as well as

---

[1] King testified at trial that Longwell obtained the appraisal for the West 4th Street property.

[2] Wilson worked with Longwell and Global Home Loans on numerous occasions prior to the West 4th Street closing. At trial, Mr. Wilson testified that he realized he paid off the wrong mortgage shortly after the West 4th Street closing. However, according to Wilson, his many attempts to contact Longwell and remedy the situation failed.

3

Longwell's existing $59,000 mortgage, while Longwell received a check for $69,382.80.

On April 4, 2005, Longwell and King executed a quitclaim deed transferring the Mary Street property to King for $40,000. Shortly thereafter, the Mary Street property appraised for $73,500, and King and Longwell agreed to increase the sale price to $64,800.[3] When the sale closed on May 16, 2005, Longwell received approximately $60,000.

Longwell's Section 341 meeting of creditors occurred on April 5, 2005. During the meeting, the Chapter 7 trustee questioned Longwell about the status of the West 4th Street and Mary Street properties. In response, Longwell stated that she sold the West 4th Street for $87,000 and received $20,000 at closing. Longwell also indicated that she did not intend to sell the Mary Street property. At the close of the meeting, the trustee instructed Longwell to provide him with a copy of the settlement statement for the West 4th Street property, and to inform him if she later decided to sell the Mary Street property.[4]

---

[3] Once again, King obtained the mortgage to purchase the property through Longwell's company, Global Home Loans.

[4] Contrary to these instructions, Longwell failed to provide the trustee with the West 4th Street settlement statement. Longwell also failed to notify the trustee that she sold the Mary Street property to King.

4

Following Longwell's Section 341 meeting, the bankruptcy trustee filed a "Notice of No Assets," informing Longwell's creditors that there were no assets to pursue. As a matter of course, the bankruptcy court granted Longwell a discharge on June 15, 2005.

In the fall of 2005, Wilson learned that Longwell was in bankruptcy at the time she sold her rental properties to King. He immediately notified the United States Trustee's office, and on November 17, 2005, Longwell's bankruptcy was reopened. Shortly thereafter, counsel for the U.S. Trustee's office filed a formal complaint seeking to revoke Longwell's bankruptcy discharge. In January of 2008, Longwell's bankruptcy discharge was revoked by agreed order.

Over a year later, Longwell was indicted in the United States District Court for the Southern District of West Virginia on one count of concealment of assets in connection with a pending bankruptcy case, in violation of 18 U.S.C. § 152(1), and two counts of making false statements in connection with a bankruptcy case, in violation of 18 U.S.C. § 152(2).

Longwell's trial began on Tuesday, April 7, 2009. The following morning, the United States rested its case and Longwell took the stand in her own defense. During Longwell's cross-examination, Longwell's attorney, George Cosenza, received word that his father had been hospitalized and was in critical

5

condition. After conferring with his client and family, Cosenza notified the court of his intent to leave as quickly as possible to be with his family. The court agreed to stop the trial, and stated that it could either continue the trial for a short period of time, or declare a mistrial. Noting that Longwell was the final witness, Cosenza asked the court to continue the trial until the following week. The government agreed, and the court continued the matter until Tuesday, April 14, 2009. Before adjourning, the court instructed the jury to refrain from discussing the case with anyone during the recess.

On April 10, 2009, the court issued an order postponing the resumption of Longwell's trial until April 15, 2009. On April 14, 2009, the court informed the parties that it had excused two jurors, leaving eleven available for trial. The court notified the parties of their right to stipulate to an eleven member jury under Federal Rule of Criminal Procedure 23(b)(2)(B), and directed them to inform the court if they wished to so stipulate. Later that day, the parties filed a written stipulation agreeing to proceed with eleven jurors.

Pursuant to the parties' stipulation, Longwell's trial resumed with eleven jurors on April 15, 2009. When the trial reconvened, Cosenza informed the court that he recently learned that the government filed an *ex parte* motion on April 14, 2009, seeking to obtain Longwell's 2002 through 2005 tax returns.

6

Cosenza further stated that he discussed the matter with Longwell, and that she instructed him to inform the court that she wished to withdraw her stipulation to proceed with eleven jurors and move for a mistrial. The court denied Longwell's motion, her trial resumed, and the jury found Longwell guilty of all counts.

The district court sentenced Longwell on August 24, 2009. At sentencing, Longwell raised several objections to the presentence investigation report. In particular, Longwell objected to the amount of loss and number of victims used to calculate her Sentencing Guideline range, as well as the two-level increase recommended in the presentence report for use of a special skill under U.S.S.G. § 3B1.3. The court denied Longwell's objections and sentenced her to forty-one months imprisonment. This appeal followed.

## II.

We first consider whether the district court erred in denying Longwell's motion for a mistrial. The decision to grant or deny a motion for a mistrial is within the discretion of the district court, and "will not be overturned absent a clear abuse of that discretion." United States v. West, 877 F.2d 281, 287 (4th Cir. 1989). On appeal, Longwell argues that the district court abused its discretion by failing to grant her motion

7

requesting a mistrial because it (1) continued her trial without her consent; (2) failed to adequately instruct the jury before recessing for the continuance; (3) excused two jurors without adequate findings of good cause; and (4) denied her request to withdraw from a stipulation to proceed with eleven jurors under Federal Rule of Criminal Procedure 23(b).

Longwell further contends that she suffered prejudice as a result of the district court's decision to deny her motion for a mistrial because (1) two jurors were unavailable when her trial resumed, and (2) the government was able to obtain her tax records for the years 2002 through 2005 for use on cross-examination. We address each of the issues raised by Longwell below.

Longwell first contends that the district court, upon learning of defense counsel's family medical emergency, should have questioned her directly about the decision to declare a mistrial or grant a continuance. In United States v. Chapman, 593 F.3d 365, 367 (4th Cir. 2010), we observed that it is "well-established that in a criminal trial, defense counsel has authority to manage most aspects of the defense without first obtaining the consent of the defendant." Following this observation, we concluded "that decisions regarding a mistrial are tactical decisions entrusted to the sound judgment of counsel, not the client." Id. at 368. Accordingly, the

district court acted well within its discretion when it assented to defense counsel's request for a continuance without first obtaining Longwell's personal consent.

Longwell next argues that the district court failed to adequately instruct the jury prior to recessing for the continuance. Prior to the continuance, the district court instructed the jurors in the following manner: "As I told you before, you haven't heard the testimony or my instructions or the closing arguments, so please don't discuss the case with anyone and please don't deliberate either together or on your own. You need to wait until you're together and you can deliberate together."

According to Longwell, the district court erred in giving these instructions because it failed to also instruct the jury to keep an open mind and mentally review the case during the continuance.[5] We disagree. Longwell's trial began on April 7,

---

[5] In advancing this argument, Longwell relies on our decision in United States v. Smith, 44 F.3d 1259 (4th Cir. 1995). In Smith, we found that the district court did not abuse its discretion by denying a defendant's request for a mistrial after a 32 day mid-trial continuance. Smith, 44 F.3d 1267. In reaching this conclusion, we observed that the district court took sufficient ameliorative measures to protect against the potential for prejudice inherent in any lengthy trial. Id. Specifically, we noted that prior to the continuance, the district court instructed the jury to "think about the case over the week so it remains fresh and remember that the time for you all to make up your minds is after the last word has been said in closing argument." Id. (internal quotations omitted). The
(Continued)

9

2009, was continued the following the day, and resumed on April 15, 2009.  In light of these facts, we conclude that the district court adequately instructed the jury prior to recessing for the continuance.

Third, Longwell asserts that the district court violated Federal Rule of Criminal Procedure 23(b) by excusing two jurors without making adequate findings of good cause.  Rule 23(b) provides that "[a]t any time before the verdict, the parties may, with the court's approval, stipulate in writing that . . . a jury of fewer than 12 persons may return a verdict if the court finds it necessary to excuse a juror for good cause after the trial begins."  Fed. R. Crim. P. 23(b)(2)(B).  On appeal, Longwell argues that the district court failed to comply with Rule 23(b) because it failed to sufficiently inquire into the circumstances surrounding each excused juror's absence and make

_____

district court also wrote a letter to the jurors during the continuance instructing them to "mentally review the case so that the passage of time will not dull your memory of the evidence, but do not reach any firm conclusions (keep an open mind)."  Id. On appeal, Longwell argues that the district court inadequately instructed the jury because it failed to give instructions similar to those given in Smith.  However, given the factual differences between this case and Smith, we are not persuaded by this argument.  See Smith, 44 F.3d at 1267-68 (noting that Smith involved three defendants whose trial began on January 25, 1993, was continued on March 11, 1993, and resumed on April 12, 1993).

appropriate findings of good cause on the record. This argument, however, is clearly refuted by the record.

During the continuance, the district court notified the parties that it had already excused one juror for "good cause shown," and that it now was forced to excuse a second juror who was "stricken ill." When the trial reconvened, the court further explained that it excused the two jurors because "one had a trip we knew about . . . [and] the other was stricken ill earlier in the week." Thus, it is clear that the district judge was fully aware of the circumstances surrounding each juror's absence at the time he excused them for good cause. Furthermore, it is important to note that Longwell never challenged the district court's findings of good cause. Indeed, Longwell acknowledged in her written Rule 23(b) stipulation that the district court had excused two jurors for good cause shown. Consequently, it is clear that the district court's decision to excuse two jurors and subsequently continue the trial in accordance with the terms of the parties' written stipulation fully complied with Rule 23(b).[6]

---

[6] In arguing that the district court failed to comply with Rule 23(b), Longwell relies on the following three cases: United States v. Araujo, 62 F.3d 930 (7th Cir. 1995); United States v. Patterson, 26 F.3d 1127 (D.C. Cir. 1994); United States v. Essex, 734 F.2d 832 (D.C. Cir. 1984). We find each to be unpersuasive given the facts of this case. In Araujo and Patterson, the district court elected to proceed with eleven (Continued)

11

Finally, Longwell maintains that the district court erred by failing to allow her to withdraw from the written stipulation to proceed with eleven jurors pursuant to Rule 23(b). We enforce stipulations "absent circumstances tending to negate a finding of informed and voluntary assent of a party to the agreement." United States v. Montgomery, 620 F.2d 753, 757 (10th Cir. 1980). Thus, a stipulation is not "absolute in its effect." Id. Rather, it is appropriate to grant a party relief from a stipulation if it is necessary to prevent manifest injustice. Id.; Marshall v. Emersons Ltd., 593 F.2d 565, 568 (4th Cir. 1979).

In the present case, there is no indication that Longwell entered into the Rule 23(b) stipulation involuntarily or by mistake. Rather, the record indicates that Longwell voluntarily entered into the stipulation after being given time to discuss the matter with her attorney, and only sought to withdraw from the stipulation after she learned of the government's intent to utilize her 2002 through 2005 tax returns on cross-examination.

jurors under Rule 23(b)(3) despite objections by each defendant. Araujo, 62 F.3d at 932; Patterson, 26 F.3d at 1128. In Essex, the district court elected to continue with eleven jurors without attempting to locate the missing juror or determine a reason for his absence. Essex, 734 F.2d at 837. Here, as discussed above, the district court was aware of the circumstances surrounding each juror's absence. Furthermore, Longwell agreed in writing to proceed with eleven jurors.

Accordingly, the district court acted well within its discretion when it denied Longwell's request to withdraw from the Rule 23(b) stipulation.[7]

We now turn to the issue of prejudice. When evaluating prejudice, we consider "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." United States v. Nyman, 649 F.2d 208, 212 (4th Cir. 1980). On appeal, Longwell argues that she suffered prejudice as a result of the denial of her motion for a mistrial because (1) two jurors were unavailable when her trial resumed, and (2) the government was able to obtain her 2002 to 2005 tax records for use on cross-examination.

As a preliminary matter, Longwell's claim that she suffered prejudice as a result of the absence of two jurors is without

---

[7] In arguing that the district court erred by denying her request to withdraw from her stipulation to proceed with eleven jurors under Rule 23(b), Longwell relies heavily on United States v. Curbelo, 343 F.3d 273 (4th Cir. 2003). In Curbelo, the district court elected to proceed with eleven jurors prior to deliberations and without the consent of the defendant in violation of Rule 23(b). Id. at 275-76. On appeal, we concluded that the district court's violation of Rule 23(b) required reversal without a finding that the defendant was actually prejudiced by the error. Id. at 281. In contrast to Curbelo, the district court in the present case waited to proceed with eleven jurors until the parties entered a written stipulation agreeing to do so as required by Rule 23(b). Accordingly, Curbelo does not, as Longwell contends, compel us to overturn her convictions.

13

merit.    Longwell voluntarily entered into a written stipulation to proceed with eleven jurors, and she cannot now claim to have suffered prejudice as a result of the absence of the very jurors she agreed to proceed without.

Longwell next argues that she suffered prejudice because the government was able to obtain her 2002 to 2005 tax records during the continuance, and prior to the completion of her cross-examination.   While this is indeed true, the district court found those records to be inadmissible, and only permitted the government to question Longwell concerning her 2005 tax return.   Accordingly, the sole issue for us to consider is whether the use of Longwell's 2005 tax return serves as a source of prejudice resulting from the district court's denial of Longwell's motion for a mistrial.   We believe it does not and therefore conclude that Longwell has failed to demonstrate any actual prejudice.

Taking into account each of the issues mentioned above, we conclude that the district court did not abuse its discretion in declining to grant Longwell a mistrial.


III.

We next decide whether the district court erred in determining Longwell's Sentencing Guidelines range.

14

Longwell first asserts that the district court improperly included interest, penalties, and late fees in its calculation of loss.[8] We review the district court's determination of the amount of loss, to the extent it is a factual matter, for clear error, and review de novo the court's legal interpretation of the term "loss" under U.S.S.G. § 2B1.1. United States v. West, 2 F.3d 66, 71 (4th Cir. 1993).

Here, the district court determined the amount of loss to be $180,000. This figure includes the $129,000 in profit Longwell realized from the sale of her two rental properties, as well as the $51,000 in unsecured debt Longwell sought to discharge through her amended bankruptcy petition. On appeal, Longwell argues that the district court erred by including in its loss calculation the full $51,000 listed in her bankruptcy petition because that amount includes interest, penalties, and late fees. In making this argument, Longwell relies on application note 3(D)(i) to U.S.S.G. § 2B1.1, which provides that "[l]oss shall not include . . . [i]nterest of any kind,

_____

[8] Longwell also argues that the district court erred by not excluding from its loss calculation the $25,000 in real estate equity she was entitled to exempt from the bankruptcy estate under West Virginia law. See W. Va. Code § 38-10-4(a). We need not address this issue in detail as it would have no impact on the loss Longwell intended to cause.

15

finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs."

As noted by Longwell, "the exclusion of interest from the calculation of loss under the Guidelines serves to prevent victims from recovering all interest they could have earned had the fraud never occurred." United States v. Coghill, 204 Fed. Appx. 328, 329 (4th Cir. 2006) (citing United States v. Morgan, 376 F.3d 1002, 1014 (9th Cir. 2004)). It does not follow, however, that the interest or penalties a defendant seeks to discharge through bankruptcy should be excluded from a sentencing court's valuation of loss in a bankruptcy fraud case. Rather, in such a case, a defendant, at the very least, intends to deprive his creditors of the full amount listed in the bankruptcy petition. It is therefore appropriate for the sentencing court to include that amount in its valuation of loss. See U.S.S.G. § 2B1.1, cmt. n.3(A) (noting that "loss is the greater of actual loss or intended loss"); United States v. Hughes, 401 F.3d 540, 557 (4th Cir. 2005) (noting that "in determining the amount of loss in a bankruptcy fraud case, courts may look to the amount of loss [the defendant] intended to cause by concealing assets") (internal citations omitted).

Longwell next contends that the district court erred in determining that her offense involved ten or more victims, and thus improperly increased her offense level by two levels under

16

U.S.S.G. § 2B1.1. We review the district court's factual determinations regarding the number of victims for clear error, and review de novo its legal interpretation of the term "victim" under U.S.S.G. § 2B1.1. United States v. Allen, 446 F.3d 522, 527 (4th Cir. 2006).

Section 2B1.1(b)(2)(A) of the Sentencing Guidelines provides for a two-level increase in a defendant's offense level if the offense involved ten or more victims. For the purposes of § 2B1.1, the term "victim" is defined as "any person who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1, cmt. n.1. At sentencing, the district court determined that Longwell caused forty-four creditors to suffer a total loss of $51,000, which was the amount Longwell sought to discharge through her amended bankruptcy petition. On appeal, Longwell argues that the government failed to introduce sufficient evidence of the loss suffered by Longwell's creditors. We disagree.

The record in this case provides ample support for the district court's determination that Longwell's creditors suffered an actual loss as required under § 2B1.1(b)(2)(A). As a result of Longwell's misconduct, the bankruptcy trustee notified her creditors that there were no assets to pursue in bankruptcy. Longwell's creditors responded by "writing off" their claims against her. As of the date of sentencing,

17

Longwell's creditors remained unpaid.  In light of these facts, it is clear that the district court did not err by increasing Longwell's offense level under U.S.S.G. § 2B1.1(b)(2)(A).

Finally, Longwell maintains that the district court erred by increasing her offense level for use of a special skill under U.S.S.G. § 3B1.3.  Longwell challenges the district court's application of § 3B1.3 in two respects.  First, Longwell contends that a mortgage broker does not qualify as someone possessing a special skill for the purposes of § 3B1.3.  Second, Longwell argues that her status as a mortgage broker did not facilitate the commission of her offense.  Whether a mortgage broker possesses a special skill for the purposes of § 3B1.3 is a question of law, and is thus reviewed de novo.  United States v. Gormley, 201 F.3d 290, 295 (4th Cir. 2000).  The district court's findings at sentencing as to Longwell's use of her skills as a mortgage broker are findings of fact reviewed for clear error.  Id.

Section 3B1.3 of the Sentencing Guidelines provides for a two level increase in a defendant's offense level if the defendant used a special skill "in a manner that significantly facilitated the commission or concealment of the offense."  The commentary to § 3B1.3 states that "'special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing.

18

Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." U.S.S.G. § 3B1.3, cmt. n.4. While mortgage brokers may not endure the same level of training as a doctor, pilot, or lawyer, they certainly possess a skill not possessed by members of the general public which is obtained through training and licensing. Thus, the skill possessed by a mortgage broker qualifies as a special skill for the purposes of U.S.S.G. § 3B1.3.

Turning to Longwell's second argument regarding § 3B1.3, the record reveals that Longwell utilized her skill as a mortgage broker to facilitate the transactions that resulted in her convictions for bankruptcy fraud. Accordingly, Longwell's argument that the district court clearly erred in determining that she used a special skill as required by U.S.S.G. § 3B1.3 is without merit.

IV

For the aforementioned reasons, we affirm Longwell's convictions and sentence.

AFFIRMED

19