In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2244

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLISE WILLIAMS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cr-0557-1 — **Virginia M. Kendall**, *Judge.*

ARGUED MAY 16, 2018 — DECIDED JUNE 6, 2018

Before FLAUM, SYKES, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge.* Charlise Williams was charged in a
five-count indictment for bankruptcy fraud. After a week-
long jury trial, she was found guilty on all counts and sen-
tenced to a below-Guidelines prison term of 46 months. On
appeal, Williams argues that the district court erred by: (1) re-
stricting her ability to cross-examine witnesses in violation of
the Confrontation Clause; and (2) applying certain Guidelines

offense-level enhancements based upon the total loss amount and number of victims. We affirm.

## I. Background

### A. Factual Background

On December 14, 1999, Williams purchased two combined condominium units (collectively, the "condominium") overseen by the South Commons Condominium Association ("SCCA"). Williams financed the purchase with a mortgage, and refinanced twice. By 2003, Williams fell behind on payments to various creditors, including to SCCA for condominium association fees.

On January 30, 2003, Williams filed the first, of eventually five, Chapter 13 Bankruptcy petitions in the Bankruptcy Court for the Northern District of Illinois. Importantly, when an individual files a bankruptcy petition, all creditors are automatically stayed from initiating debt collection activities. Her scheme was generally as follows. After filing for bankruptcy, Williams would fail to make all required payments as required by her Chapter 13 payment plan. As a result, the bankruptcy court would dismiss the case. After the dismissal, SCCA would often file eviction and collection suits. Williams would then file a new Chapter 13 bankruptcy petition in order to stay the action. Again, Williams would fail to make most of the required plan payments, and the cycle would continue.

Notably, after voluntarily dismissing her second bankruptcy petition, Williams arranged to temporarily transfer the condominium to a companion, Ekkehard Wilke. On March 21, 2005, Williams and Wilke signed two documents: a warranty deed by which Williams transferred the condominium to Wilke, and a quitclaim deed that returned title to Williams.

Williams recorded the warranty deed on April 12, 2005 and the quitclaim deed on May 12, 2005. At Williams's trial, Wilke testified that he provided nothing of value in exchange for title and never lived in the condominium. With title in his name, Wilke obtained two mortgage loans secured by the condominium. Neither Williams nor Wilke made all the required payments. Moreover, in her bankruptcy petitions that followed, Williams failed to disclose the transfers of her condominium to and from Wilke. Additionally, she told the bankruptcy court that Wilke was a co-debtor and agreed to contribute $1,324 a month toward the mortgage. However, at trial, Wilke testified this was not true.

After dismissing Williams's fifth and final petition, on December 4, 2009, the bankruptcy court also barred Williams from filing a new bankruptcy case for 180 days. As a result, SCCA's eviction suits could proceed. However, in January 2010, Williams and Wilke agreed to a plan that Williams believed could prevent eviction: Williams would transfer title of the condominium to Wilke, and Wilke would file for bankruptcy in his name. Like in 2005, Williams prepared two deeds—a warranty deed transferring title from Williams to Wilke, and a quitclaim deed transferring title back to Williams. Wilke and Williams signed both deeds, which were later notarized. The warranty deed was recorded on February 1, 2010. The quitclaim deed was not recorded until March 4, 2011.

On February 9, 2010, Wilke filed a Chapter 13 bankruptcy petition stating the condominium was his property. Because neither Wilke nor Williams made the required plan payments, Wilke's attorney suggested converting the bankruptcy to a Chapter 7 case. Wilke testified Williams opposed this change

because she would lose ownership of the condominium. In April 2010, an attorney filed a motion on behalf of Wilke requesting an order staying SCCA's eviction proceedings and seeking sanctions against SCCA. The motion stated that Wilke owned the condominium and Williams rented from Wilke. At trial, however, Wilke testified that he did not retain this attorney or ask him to file the motion. On May 11, 2010, Wilke admitted to the bankruptcy court that he testified falsely to benefit Williams, and the court dismissed his bankruptcy case.

## B.  Procedural Background

On October 2, 2014, Williams and Wilke were charged in a five-count indictment for bankruptcy fraud under 18 U.S.C. §§ 157(1) and (2). Wilke pled guilty to a misdemeanor and agreed to cooperate with the government in its prosecution of Williams. Williams proceeded to trial, which began on June 13, 2016. The government called several witnesses, including SCCA board member Carrolyn Patterson, SCCA attorney David Sugar, and Wilke.

Relevant to this appeal, on cross-examination, defense counsel sought to ask Patterson and Sugar about a class action lawsuit Williams had filed against SCCA in order to show that SCCA had strong negative feelings about Williams. Additionally, Williams sought to ask the witnesses about SCCA's treatment of Williams relative to other tenants, and specifically, whether SCCA offered her a payment plan. The government raised a Federal Rule of Evidence 403 objection to this line of questioning. The court, while recognizing that Williams could cross-examine the witnesses to show bias, restricted questioning as to these topics. It permitted defense counsel to ask the witnesses whether they were aware of Williams's role in filing the class action and the related legal fees, but barred further

inquiry into the substance of her allegations. It reasoned that the topics "raise[d] a jury nullification issue" because they were an attack on the underlying debt, which was irrelevant to the elements of bankruptcy fraud.

On June 20, 2016, after a week-long jury-trial, Williams was found guilty on all five counts charged in the indictment; on December 14, the district court denied Williams's motion for acquittal or a new trial. The court held a sentencing hearing on May 30, 2017. It determined Williams had a base offense-level of 6 and criminal history category of I. The government sought several offense-level enhancements, two of which are relevant to this appeal: ten levels for causing a total loss greater than $150,000 and two levels because the offense involved ten or more victims. The government calculated total loss at $193,291—"the increase in the amount of money that defendant owed to her creditors (and which the creditors were prevented from trying to collect) between when she filed her first bankruptcy case and when she filed her fifth one." It determined that Williams's offense involved more than ten victims because in 2009, Williams had over thirty creditors she did not have in 2003. Williams, on the other hand, maintained that "the sole purpose of the scheme was for Ms. Williams to maintain control of her condominium" and therefore, "liability should be limited … to the loss that directly relates to [SCCA]." She estimated that loss as $45,694—which warrants only a six-level increase—and claimed the only victim was SCCA—which warrants no victim enhancement. The court sided with the government. It explained:

> [T]he fraudulent invocation of the automatic
> stay stayed all creditors from … barking at her

> door. So each time the stays were filed, … any-
> one that was in the queue waiting to be paid
> would be considered both a victim of the stays
> as well as for the loss amount.

With the enhancements, Williams's adjusted offense level was 24; combined with a criminal history category of I, the Guidelines Range was 51–63 months' imprisonment. Ulti-mately, the district court imposed a below-Guidelines prison term of 46 months.

## II. Discussion

### A. Cross-Examination

Williams first argues the district court erred in limiting the scope of cross-examination of witnesses Patterson and Sugar. The Sixth Amendment's Confrontation Clause guarantees criminal defendants the right to confront witnesses at trial. *United States v. Linzy*, 604 F.3d 319, 323 (7th Cir. 2010). It "re-flects the belief that adversarial proceedings are essential to the truth-seeking function." *United States v. Khan*, 508 F.3d 413, 418 (7th Cir. 2007). Thus, "a district court must allow effective cross-examination." *Linzy*, 604 F.3d at 323. But effective cross-examination is not akin to unlimited cross-examination. *See id.*

"[W]hen deciding whether limits on cross-examination are permissible, we must first distinguish between the core values of the Confrontation Clause and more peripheral con-cerns which remain within the trial court's ambit." *Id.* (altera-tion in original) (quoting *United States v. Reyes*, 542 F.3d 588, 593 (7th Cir. 2008)). "[O]ne such core value is the ability to ex-pose a witness's motivation for testifying, his bias, or his pos-

sible incentives to lie … ." *Id.* (quoting *United States v. Recendiz*, 557 F.3d 511, 530 (7th Cir. 2009)); *see also United States v. Manske*, 186 F.3d 770, 778 (7th Cir. 1999) ("[E]xposing witness bias is at the 'core' of the confrontation right."). Thus, if "'the defense is completely forbidden from exposing the witness's bias or motive to testify,' then the constitution is implicated." *Manske*, 184 F.3d at 778 (quoting *United States v. Sasson*, 62 F.3d 874, 883 (7th Cir. 1995)).

Critically, however, "the Sixth Amendment is not implicated every time a limit is placed on a defendant's right to expose bias." *Id.* Indeed, "once a trial court permits a defendant to expose a witness's motivation, it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury." *Linzy*, 604 F.3d at 323 (internal quotation marks omitted) (quoting *Recendiz*, 556 F.3d at 530). Put another way, "the Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (internal quotation marks omitted) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987)).

We first review, de novo, "whether the limit foreclosed an opportunity to expose biased or false testimony, thereby affecting the 'core functions' of the Confrontation Clause." *Khan*, 508 F.3d at 418 (quoting *United States v. Smith*, 454 F.3d 707, 714 (7th Cir. 2006)). Then, to the extent "the 'core functions' of the Confrontation Clause remain intact, [we] ensure[] merely that the district court's exercise of its 'wide discretion' in limiting cross-examination was not abusive." *Id.* (quoting *Smith*, 454 F.3d at 714).

Williams argues her Confrontation Clause rights were violated because "[t]he jury was deprived of the ability to observe Ms. Patterson's and Mr. Sugar's demeanor when confronted with questioning as to their bias against Ms. Williams or motives to lie." Specifically, she maintains that defense counsel was barred from asking about the class action filed against SCCA and about SCCA's treatment of Williams compared to other tenants. We disagree. To be sure, the court limited the extent to which Williams could question Patterson and Sugar as to these issues. But contrary to Williams's claim, defense counsel "was not entirely precluded from delving into the discussion." *See Reyes*, 542 F.3d at 594.

First, the district court permitted defense counsel to ask Patterson and Sugar a series of questions relating to the class action. Patterson testified on cross that she was aware of the lawsuit, that SCCA paid legal fees to defend the lawsuit, and that Williams attempted to recruit other tenants to join the class. The court reasoned:

> I think that there's some area of cross available for that, which is that [Patterson has] come here as a government witness, her testimony is for the purpose of proving the government's case, and she has this history with the defendant that might make her biased against her and more biased for the government. Bias is always an area of cross.

Likewise, the court allowed Williams to pose questions about the class action, including legal fees, to Sugar. It told defense counsel:

> [T]he fact that [Williams and SCCA are] in litigation and the fact that [Sugar] is actually the attorney that defended the person that [Williams] sued, I think that can be an angle of bias. You can explore it only for that purpose, but not for relevancy to the charge, because you haven't articulated a defense theory yet as to how it could be.[1]

Second, the court allowed defense counsel to ask several questions about SCCA's treatment of Williams relative to other tenants, and specifically, about the availability of payment plans. As the court wrote in rejecting Williams's motion for a new trial:

> In truth, the Court permitted numerous questions regarding whether others were given payment plans and whether the defendant was offered one. The Court also permitted the line of questions that elicited that Williams may have been treated differently because she had filed a lawsuit, encouraged others to join her in her lawsuit, and was not offered a payment plan. As such, the defense was given the materials that it needed to argue, if it wanted, that Williams was treated differently by [SCCA] due to her filing of the lawsuit.

---

[1] As the district court noted in denying Williams's motion for acquittal or a new trial, defense counsel's questioning of Sugar "fell flat because Sugar testified that no lawsuit was filed."

In short, the district court allowed Williams to "*establish* that [Ptterson and Sugar] may have had a motive to lie"; it is therefore permissible that the court's "limitations denied [Williams] the opportunity to *add extra detail* to that motive." *See Linzy*, 604 F.3d at 324 (quoting *Recendiz*, 556 F.3d at 530).[2]

Because the court's cross-examination limitations did not impact the "core functions" of the Confrontation Clause, we review only for abuse of discretion. We "give[] district courts 'wide latitude' and 'allow[] [them] to set reasonable limits on the scope and extent of cross-examination based on concerns about … harassment, prejudice, confusion of the issues, the witness's safety [and] marginal[] relevance.'" *Manske*, 186 F.3d at 777 (first and second alterations added) (quoting *United States v. Graffia*, 120 F.3d 706, 712 (7th Cir. 1997)).

The district court did not abuse its discretion. It limited cross-examination of issues relating to the class action and

---

[2] Williams's citation to *Davis v. Alaska*, 415 U.S. 308 (1974) is not persuasive. In *Davis*, the Court found a Confrontation Clause violation because "[w]hile counsel was permitted to ask [the witness] whether he was biased, counsel was unable to make a record from which to argue why [the defendant] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Id.* at 318. The Court explained that "[o]n the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness." *Id.* Here, in contrast, the district court did not just allow defense counsel to ask Patterson and Sugar if they were biased. Instead, it allowed counsel to ask the witnesses, for example, whether they knew about the class action and about legal fees. Thus, unlike in *Davis*, defense counsel *was* "permitted to expose to the jury the facts from which jurors … could appropriately draw inferences relating to the reliability of the witness." *See id.*

SCCA's treatment of Williams because it determined that such testimony had minimal-to-no relevance and imposed a risk of prejudicing and confusing the jury. Specifically, the court explained that "any kind of battle that [Williams] had with [SCCA] regarding the assessments raises a jury nullification issue" because:

> It's essentially saying that the debts that she's presenting in the bankruptcy are debts that shouldn't have been debts in the first place, so it's like a collateral attack on a debt that is the debt that [Williams is] trying to get rid of, whereas the elements of bankruptcy fraud have nothing to do with [determining] whether the debt is a valid debt.

In other words, "it isn't a defense for this jury to unilaterally … look at the problem in the underlying debt and say … that's not a good debt." The court did not want the jury "to believe that they [could] reach a conclusion that says [SCCA] didn't treat [Williams] well, so we're going to acquit because that was bad for her." The court acted well within its discretion in recognizing the "marginal relevance" of the testimony and concerns about "prejudice" and "confusion of issues." *See Manske*, 186 F.3d at 777.

## B. Sentencing Guidelines

Next, Williams challenges the district court's application of two specific offense characteristics used to determine her Guidelines adjusted offense level. She argues the district court erred in: (1) calculating the total loss amount; and (2) determining the number of total victims. We review the court's factual findings related to its Guidelines calculation—including

its determination of total loss and number of victims—for clear error. *United States v. Rosen*, 726 F.3d 1017, 1024 (7th Cir. 2013); *United States v. Harris*, 718 F.3d 698, 703 (7th Cir. 2013).

### 1. Loss Calculation

"The Sentencing Guidelines provide for an increase in offense level based upon the amount of loss resulting from an offense." *Rosen*, 726 F.3d at 1024; *see* U.S.S.G. § 2B1.1(b)(1). For purposes of this provision, "loss" means "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). Actual loss, which is what the government sought to prove here, is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* To be "reasonably foreseeable," the defendant must have known, or reasonably should have known, that the pecuniary harm "was a potential result of the offense." *Id.* "It is the government's burden to prove the loss amount by a preponderance of the evidence." *United States v. Johns*, 686 F.3d 438, 454 (7th Cir. 2012).

"[T]he calculation of loss in a bankruptcy fraud case can be rather complicated." *United States v. Edgar*, 971 F.2d 89, 93 (8th Cir. 1992). Thus, "the district court need only make 'a reasonable estimate of the loss' in applying the enhancement." *United States v. White*, 737 F.3d 1121, 1142 (7th Cir. 2013) (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)). "[O]n appeal, a defendant must 'show that the court's loss calculations were not only inaccurate but outside the realm of permissible computations.'" *Id.* (quoting *United States v. Love*, 680 F.3d 994, 999 (7th Cir. 2012)). We reverse "only when we are 'left with the definite and firm conviction that a mistake has been made.'" *Id.* (quoting *United States v. Cruz-Rea*, 626 F.3d 929, 938 (7th Cir. 2010)); *see also United States v. Gordon*, 495 F.3d 427, 431 (7th Cir. 2007) ("The district court judge is in the best position to assess the

evidence and estimate the loss based on that evidence and thus this court must defer to the district court's determination of loss—and of course, its determination that the government has met its burden of providing a reasonable estimate of loss.").

Here, the court reasonably adopted the government's calculation to impose a ten-level sentencing enhancement. *See* U.S.S.G. § 2B1.1(b)(1). It estimated, based on the "losses that [Williams] herself admitted to in the filings … for the bankruptcy relief," that her increase in liabilities from 2003 to 2009 was $193,291. And it rejected Williams's proposed alternate calculation of $45,694 that was based solely on the loss directly related to SCCA. The court's determination is not clearly erroneous and is supported by evidence at trial. Williams's liabilities increased from $233,605 to $426,896 between her first and final bankruptcies, and her fraudulent use of Chapter 13 caused the loss to her creditors.[3] In fact, as the district court stated, its total loss estimate was quite "conservative." Williams's fraudulent activity occurring after 2009—namely, transferring the condominium to Wilke so he could file a Chapter 13 bankruptcy—resulted in additional loss to Williams's creditors.

Williams maintains the district court erred because "there was no evidence presented—either at trial or at sentencing—

---

[3] Williams's citation to *United States v. Whiting*, 471 F.3d 792 (7th Cir. 2006) is misplaced. There, the district court "correctly" acknowledged that the standard required causation and stated that the defendant's "misrepresentations … caused the total loss," but conceded certain facts were "not really causal of losses." *Id.* at 802. We thus held that "the district court improperly applied the loss causation standard by finding both no causation and causation." *Id.* Here, however, there was no such mixed finding.

that the underlying debts or the increase in debts, were the results of criminal or unlawful conduct." *See United States v. Schaefer*, 291 F.3d 932, 939–40 (7th Cir. 2002) (noting the government must demonstrate that the alleged fraudulent activities "were unlawful"). This argument is not persuasive. Here, the relevant question is not whether the debt was lawfully incurred. Rather, what is pertinent is that by convicting Williams of bankruptcy fraud, a jury determined that she filed multiple Chapter 13 bankruptcy petitions in bad faith. As the district court explained, Williams "fraudulent[ly] invo[ked] … the automatic stay" to hide from her creditors and prevent them from recovering their debts.

Williams also argues the district court failed to address whether creditors other than SCCA were impacted. We disagree. "[W]hen we evaluate the entirety of the sentencing transcript and review the district court's conclusion in context," it is clear the district court "made sufficient findings for us to meaningfully review its decision." *See White,* 737 F.3d at 1140. The district judge explained that she understood the difference between Williams's and the government's arguments; Williams believed liability was limited to loss related to SCCA, while the government thought Williams also caused loss to other creditors. In siding with the government, the court explained that Williams's scheme impacted "all creditors." Even Williams concedes that the indictment against her "alleged loss to multiple creditors." Therefore, the district court's loss calculation was certainly within "the realm of permissible computations." *See id.* at 1142.

### 2. Number of Victims

The Sentencing Guidelines provide for a two-level increase in the offense level "[i]f the offense … involved 10 or

more victims." U.S.S.G. § 2B1.1(b)(2)(A)(i). For purposes of the Guidelines, "victim" means "any person who sustained any part of the actual loss determined under subsection (b)(1)." *Id.* § 2B1.1 cmt. n.1. The burden is on the government to show that "the individuals suffered pecuniary harm." *United States v. Sutton*, 582 F.3d 781, 785 (7th Cir. 2009).

Again, the district court adopted the government's view and imposed a two-level sentencing enhancement. It reasoned that even if the purpose of Williams's scheme was "primarily to keep herself within the condominium, there were so many other people that were owed that did not get paid as a result." Indeed, the court emphasized that Williams had sixty creditors in 2009 compared to just thirty-one in 2003.

Williams contends "[t]he district court erred when it counted each of Ms. Williams' creditors as victims for purposes of U.S.S.G. § 2B1.1." Specifically, she maintains the government "failed to show any pecuniary harm to creditors other than SCCA." Not so. The district court explained why it rejected Williams's argument that SCCA was the only victim:

> [T]he fraudulent invocation of the automatic stay stayed all creditors from … barking at her door. So each time the stays were filed, … anyone that was in the queue waiting to be paid would be considered … a victim of the stays as well as for the loss amount.

Courts have consistently recognized that creditors can be considered victims in bankruptcy fraud cases for purposes of a Guidelines offense-level increase. *See United States v. Middlebrook*, 553 F.3d 572, 575 (7th Cir. 2009); *see also United States v. Longwell*, 410 F. App'x 684, 691 (4th Cir. 2011); *United States v.*

*Saacks*, 131 F.3d 540, 543 (5th Cir. 1997); *United States v. Shadduck*, 112 F.3d 523, 531 (1st Cir. 1997); *United States v. Nazifpour*, 944 F.2d 472, 474 (9th Cir. 1991). Thus, the district court did not clearly err in determining there were more than ten victims.[4]

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[4] Williams's reliance on *United States v. Sutton* is not helpful. *Sutton* is a health care fraud case, where we held that a district court erred in imposing an offense-level increase based on the number of victims because "it [was] not immediately apparent how [the] harms translate[d] to the monetary harm clearly required under § 2B1.1." 582 F.3d at 785. Here, as discussed above, the district court reasonably concluded that Williams's fraudulent bankruptcy scheme *did* cause her creditors' monetary harm.